MONTGOMERY PROPERTIES
CORPORATION, Appellee,

v.

ECONOMY FORMS CORPORATION,
Appellant.

No. 64771.

Supreme Court of Iowa.

May 13, 1981.

William J. Koehn and Jill S. Rolek of
Davis, Hockenberg, Wine, Brown & Koehn,
Des Moines, for appellant.

John R. Mackaman and F. Richard Lyford of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, for appellee.

Considered by REYNOLDSON, C. J., and LeGRAND, McGIVERIN, LARSON, and SCHULTZ, JJ.

REYNOLDSON, Chief Justice.

Defendant Economy Forms Corporation (EFCO) appeals from judgment entered on a jury verdict for plaintiff Montgomery Properties Corporation (MPC) in its slander of title action. MPC cross-appeals because the court, on an issue reserved to it by stipulation, refused to award MPC attorney fees as a part of its damages. We modify and affirm on condition and remand on the appeal, and affirm on the cross-appeal.

From the evidence the jury could have found the following facts. EFCO is a Des Moines-based manufacturer of steel concrete forms. This corporation owned and platted the fourteen-lot EFCO Industrial Park. Al Jennings, EFCO's executive vice president, was fully authorized by his corporation to represent it in the real estate transactions involved in this controversy.

MPC is a corporation organized for real estate development and owned by Charles Irvine and John Hart. David Frost was associated with them in a companion realty company, Montgomery Realty, which operated out of the same office. Ordinarily MPC would acquire land and build a structure for a customer that wanted to lease, not own, the premises.

MPC was negotiating to construct and lease a building to Onthank Company. Frost talked to Jennings about acquiring lots 1 and 2 in EFCO's industrial park for this purpose. Jennings testified he told Frost:

[W]e will not sell a piece of land unless we know what is going on the ground, how it is going to be used, consistent with the Industrial Park. We wanted to keep a very attractive area there. And we required ... more setback and we required a plan ....

EFCO refused to sell lot 1 and the parties settled on lot 2. EFCO wanted to use the tax-saving device of a three-party trade. Consummation of the transaction lagged and in September 1977, Irvine, anxious to begin construction, telephoned Jennings with a proposal to buy lot 2 for cash. Jennings refused because EFCO would lose the tax advantage of the three-party transaction. Irvine then proposed to buy lot 2 outright, and then trade lot 2 for lot 3. Jennings objected to this because EFCO "won't have any say then as to what goes on that lot [3]." MPC had disclosed the Onthank building plans to EFCO.

The result was that MPC acquired lot 2 by deed and lot 3 under a September 23, 1977, exchange agreement involving the third-party owners of a Washington state property. This typewritten agreement was drafted by EFCO's attorney and signed by Jennings for EFCO. In this instrument EFCO warranted it would, *inter alia,*

perform all steps reasonably required by the attorney for Montgomery to convey good and merchantable title to Montgomery to [lot 3], free and clear of all liens and encumbrances, reservations, exceptions or modifications *except as in this Agreement otherwise expressly provided,* none of which will prevent the use of the property as a warehouse ....

(Emphasis supplied.) Another provision provided that MPC "will receive an abstract and warranty deed to [lot 3] free and clear of all liens and encumbrances, reservations, exceptions or modifications except as in this Agreement otherwise expressly provided." The same language appeared again in another provision relating to a title opinion for MPC. It was further stipulated that this agreement "supersedes any contracts or Offers to Buy and Sell Real Estate which may previously have been executed."

As a result of this three-party exchange agreement, MPC obtained a warranty deed to lot 3 without any reservations or exceptions, and EFCO acquired $5000 paid by MPC in cash, and a mortgage on lot 3 for $78,225.

In the course of constructing the Onthank building on lot 2, MPC encountered difficulty in obtaining a county occupancy permit because of a drainage problem. MPC had several meetings with Jennings of EFCO relating to this situation. Ultimately, EFCO paid for the engineering and earthwork to resolve the drainage problem for a number of lots, and informed MPC its share was $8000 for the two lots. Irvine of MPC denied he ever agreed to pay $4000 per lot. However, Hart wrote a July 25, 1978, letter to Jennings in which he agreed, for MPC, to pay EFCO $4000 each for controlling water runoff on lots 2 and 3. The $4000 for lot 2 was to be paid when the occupancy permit for the Onthank warehouse was issued, and the $4000 for lot 3 was to be paid "at the time the land contract for Lot 3 has been fully performed." Irvine testified he was "hot" when he learned of this letter but "if [Hart] writes a letter saying we owe $4000, I guess I will pay it." The $8000 was never paid.

MPC eventually contracted to sell lot 3 to Sturm Freightways, Inc., for $116,515. When one of the realtors called Jennings regarding the mortgage balance, she told him the lot was to be used as a truck terminal. Jennings became angry and told the realtor that he would not let a truck terminal go in, "that they had some restrictions on the property and ... they just weren't going to allow it." He stated he was going to do everything within his legal rights to make sure that the property was not developed without him "having the rights to approve what went on there." Jennings told another realtor he would not release the mortgage; that there was a "prior agreement."

In a subsequent conversation with Frost of MPC, Jennings stated several times he would never permit a truck terminal on lot 3 and would appeal the case to the supreme court if he had to. He said he would "screw Fisher but good as far as Lot 1 was concerned." Fisher was an Onthank employee who hoped to acquire an interest in the development of lot 3. Jennings later told Hart he would "get [them] all individually"; that he would "see [them] in hell before he released that mortgage."

September 29, 1978, MPC unsuccessfully tendered $81,388.29 to EFCO in satisfaction of its mortgage on lot 3. After MPC notified Sturm it could not complete the sale due to EFCO's refusal to release the mortgage, Sturm rescinded the purchase contract because, *inter alia*, "[r]estrictions on the property are substantially at variance with the original representations made," in that "[p]revious owners ... have restricted the use of the property so as to prohibit [its use] as a truck terminal facility."

MPC paid Sturm damages of $3500 and also paid a realtor $3495 as lost commission. October 27, 1978, lot 3 was sold to Des Moines Cold Storage for $105,862 and the buyer assumed the EFCO mortgage. In connection with the closing of this transaction, EFCO's mortgage statement showed an additional lien of $8000 pursuant to a "Water run off Agreement Lots 2 & 3 Secured as open end advance." The buyer then insisted that $8000 of the purchase money be placed in escrow.

Count I of MPC's petition alleged its ownership of lot 3, its sales contract to Sturm, EFCO's assertions to Sturm and the realtors of "restrictions, reservations, and servitudes outside of the record," its refusal to release the mortgage lien, and the resulting rescission of the sale. MPC claimed $50,000 in actual damages and $50,000 in punitive damages. Count II was based on EFCO's claim, in its balance due statement submitted with respect to the sale to Des Moines Cold Storage, that its mortgage secured the additional $8000. MPC claimed $25,000 actual and $25,000 punitive damages on this count.

EFCO's answer affirmatively alleged it had "reserved the right to approve any building," and that MPC had so agreed and should be estopped to deny its oral agreement. The answer requested that the exchange agreement be reformed to incorporate the oral agreement. Finally, EFCO counterclaimed for $8000 under the oral water runoff agreement and prayed that this additional amount be declared secured by its mortgage.

MPC filed a pretrial "Motion for Advance Ruling on Evidence." This motion alleged the exchange agreement was an integrated writing prepared by EFCO's lawyer that stated it superseded previous contracts, and requested that EFCO's lawyer be admonished not to inquire of witnesses as to any agreements other than those reflected in the exchange agreement and deed because any such testimony would be barred by the parol evidence rule. Trial court granted this motion.

The jury returned a verdict for $35,000 compensatory and $10,000 punitive damages on count I, and $1000 compensatory and $1000 punitive damages on count II. EFCO was awarded $8000 on its counterclaim. EFCO filed several posttrial motions. Trial court granted a remittitur motion as to count I only, granting a new trial unless MPC filed a remittitur of the count I actual damage award over and above the sum of $17,644. MPC filed the remittitur. Nonetheless, EFCO appealed and MPC cross-appealed. The issues raised by these parties are discussed below.

I. *Did trial court err in excluding, on the basis of the parol evidence rule, defendant's evidence of an oral agreement concerning lot 3?*

EFCO argues evidence of the alleged prior oral agreement that it was to have control over use of lot 3 should have been admitted to rebut malice in MPC's tort and punitive damage claims, and for proof on its counterclaim for reformation of the exchange agreement.

We first dispose of the reformation contention. This was an equity issue reserved to the court. *See First National Bank v. Curran*, 206 N.W.2d 317, 320 (Iowa 1973). The parties now agree trial court's pretrial ruling excluding evidence of the alleged oral agreement effectively disposed of the reformation claim.

■ It is true that ordinarily parol evidence is admissible in actions for the reformation of legal instruments so long as the evidence is relevant and material. *Skubal v. Meeker*, 279 N.W.2d 23, 27 (Iowa 1979); *Blackman v. Folsom*, 200 N.W.2d 542, 543

(Iowa 1972). But generally a writing will be reformed only if the party seeking reformation clearly and convincingly establishes that it does not express the true agreement of the parties because of fraud or duress, mutual mistake of fact, mistake of law, or mistake of one party and fraud or inequitable conduct on the part of the other. *Kufer v. Carson*, 230 N.W.2d 500, 504 (Iowa 1975); Thompson, *Reformation of Written Instruments in Iowa*, 23 Drake L.Rev. 327, 331–35 (1974).

■ The record made in this case clearly demonstrates none of these grounds for reformation were pleaded, nor do any of them apply. Jennings, called as a witness by MPC, testified the exchange agreement was drafted by EFCO's lawyer at his request and directions and that he then was satisfied and at the time of trial still was satisfied with the agreement. Testifying for the defense, Jennings expressed the philosophy that in his real estate transactions he had long had an aversion to "long lists of covenants" running with the real estate, and therefore adopted the practice of determining what people were going to build on the lots before selling them.

Of course this policy was not applied in the sale of lot 3. But we are satisfied that to whatever limited extent evidence was excluded in this case, it was harmless error with respect to the reformation claim. We are not required to determine whether EFCO's remedy was rescission on the ground it was induced to enter into the contract by some species of fraud or misrepresentation. *See* Thompson, *supra*, at 337. It is plain the exchange agreement expressed the true agreement of the parties, but EFCO wanted it reformed to make a new and different contract. This is impermissible. *See Kufer*, 230 N.W.2d at 503; *Decker v. Juzwik*, 255 Iowa 358, 370, 121 N.W.2d 652, 658 (1963).

We next turn to EFCO's contention this ruling prevented it from showing evidence of an oral agreement relating to the use of lot 3 that would be relevant to MPC's tort and punitive damage claims.

EFCO starts from the premise that malice is an essential element of a slander of title action, *Witmer v. Valley National Bank*, 223 Iowa 671, 673, 273 N.W. 370, 371 (1937), and is negated if the statement was made by the defendant in good faith and if the act complained of was founded upon probable cause, or was prompted by a reasonable belief even though the statement may have been false. *Guldberg v. Greenfield*, 259 Iowa 873, 886, 146 N.W.2d 298, 306 (1966); *Miller v. First National Bank*, 220 Iowa 1266, 1269, 264 N.W. 272, 274 (1935). Similarly, EFCO points out that state of mind and intent also are relevant areas of inquiry on the question of punitive damages, citing *McCarthy v. J. P. Cullen & Son Corp.*, 199 N.W.2d 362, 369 (Iowa 1972), and *Inman v. Ball*, 65 Iowa 543, 546, 22 N.W. 666, 668 (1885). It follows, EFCO argues, that its defense of good faith and reasonable belief, negating malice, was choked off by trial court's exclusion of evidence relating to the alleged prior oral agreement reserving to EFCO control over the use of lot 3.

At the outset we note trial court's ruling was carefully circumscribed and did not

> exclud[e] any testimony as far as the aforesaid ruling is concerned, which may relate to admissions or actions had or occurring subsequent to the date of the so-called exchange agreement covering Lots 2 [*sic*] and 3 ... any testimony concerning the statements made by representatives of the Plaintiff for [*sic*, or] action taken by representatives of the Plaintiff relating to any purported agreement concerning the use of the real estate, which actions or admissions occurred after September 23, 1977, may well be admissible as bearing on the issues of the good faith or lack of malice on the part of the Defendant.

EFCO successfully introduced testimony from Jennings relating to the alleged oral agreement and to various communications referring to it following execution of the exchange agreement. He testified that when he first was contacted by Frost of MPC he told him "that we will not sell a piece of land unless we know what is going on the ground, how it is going to be used, consistent with the Industrial Park." Jennings testified that after he learned of the Sturm sale he got mad and called Hart "[a]nd John probably wonders why I was mad at him because he wasn't really a party to any of the agreement, what [will] go on these properties." When Jennings was questioned about an effort to settle the controversy with Irvine, the following exchange occurred:

Q. All right. Did you discuss with Mr. Irvine the fact that you felt you had an agreement with his company, that that lot was not going to be built on without your approval?

A. Absolutely.

Q. Okay. And did he disagree with that?

A. No, he did not disagree with that.

In Irvine's cross-examination EFCO was permitted to ask Irvine if it was not a fact that Jennings, before the sale of lot 3, stated that "[o]nly if you will allow me to approve these plans for development of Lot 3, will I sell you that lot," which statement was denied by Irvine. Other of MPC's witnesses testified to statements made by Jennings following the Sturm sale that he had a prior agreement as to the use of lot 3, and that it was not to be used as a truck terminal.

We find EFCO was not "choked off" on its defense of good faith and reasonable belief. The issue ultimately was developed fully. EFCO made no offer of further proof by any witness. We are unable to find any harm to EFCO arising out of the court's ruling.

Moreover, we find the additional evidence, if there was any that does not already appear in the record, properly was excluded under the parol evidence rule.

The parol evidence rule is not a rule of evidence, but a rule of substantive law. *Salsbury v. Northwestern Bell Telephone Co.*, 221 N.W.2d 609, 611 (Iowa 1974); *Weik v. Ace Rents, Inc.*, 249 Iowa 510, 516, 87 N.W.2d 314, 318 (1958); 30 Am.Jur.2d *Evidence* § 1017 (1967). Although extrinsic

evidence may be admissible to explain the real meaning of the parties by the language used in a contract, *Hamilton v. Wosepka,* 261 Iowa 299, 306, 154 N.W.2d 164, 168 (1967), the parol evidence rule forbids the use of extrinsic evidence to vary, add to, or subtract from a written agreement, *Associated Grocers of Iowa Cooperative, Inc. v. West,* 297 N.W.2d 103, 109 (Iowa 1980); *Pappas v. Hauser,* 197 N.W.2d 607, 611 (Iowa 1972). The principle behind the rule is that

> when the parties have discussed and agreed upon their obligations to each other and reduced those terms to writing, the writing, if clear and unambiguous, furnishes better and more definite evidence of what was undertaken by each party than the memory of man .... The rule rests upon a rational foundation of experience and policy and is *essential to the certainty and stability of written obligations.* It is designed to permit a party to a written contract to *protect himself* against perjury, infirmity of memory, or the death of witnesses.

30 Am.Jur.2d *Evidence* § 1016, at 151–52 (1967) (emphasis supplied). In our view this rationale does not become inapplicable simply because this slander of title action sounds in tort. MPC's claims are grounded in a written agreement between the parties, which three times assured MPC it was to have merchantable title free and clear of all liens and encumbrances, reservations, exceptions, or modifications except as otherwise agreed in the instrument. EFCO's defense is based on an alleged oral agreement, which would affect the title and nullify important provisions in the exchange agreement.

■ Of course, parol evidence is admissible to show a writing is not an integrated agreement. *In re Eickman Estate,* 291 N.W.2d 308, 312 (Iowa 1980); *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.,* 266 N.W.2d 22, 25 (Iowa 1978). But in neither of those cases did the contract state it superseded all previous agreements. In *Eickman,* there was evidence to suggest that one of the parties did not know it was to be a completely integrated contract. 291

N.W.2d at 312. In this case the instrument not only declared it superseded all previous contracts, it elsewhere disclosed its integrated character on the point here in issue by declaring EFCO retained no "liens and encumbrances, reservations, exceptions or modifications" except as disclosed in the exchange agreement.

■ An integrated agreement is one in which the parties adopt a writing or writings as the final and complete expression of the agreement. *Kitchen v. Stockman National Life Insurance Co.,* 192 N.W.2d 796, 800 (Iowa 1971). Some courts have held an integration clause like the one before us reinforces application of the parol evidence rule to prevent proof of an alleged prior contract. *R. G. Varner Steel Products, Inc. v. Puterbaugh,* 233 Ark. 953, 955–56, 349 S.W.2d 805, 807 (1961); *Fogelson v. Rackfay Construction Co.,* 300 N.Y. 334, 340, 90 N.E.2d 881, 884 (1950). Other cases indicate an integration clause should not be controlling on the issue of whether the written contract is the whole integrated agreement, so as to exclude parol evidence on the issue. *See Luther Williams, Jr., Inc. v. Johnson,* 229 A.2d 163, 165 (D.C.App. 1967); *Blaha v. Schwartz,* 7 Ohio Op.3d 234, 236–37 (Ct.Comm.Pl.1977). We hold in these circumstances where the handcrafted contract contains an integration clause, where the parties were sophisticated business persons represented by counsel and of equal bargaining strength, and where terms of the alleged oral agreement reasonably would be expected to be included in the exchange agreement, trial court did not err in sustaining a parol evidence rule objection, thus excluding evidence to vary its terms.

We have examined the other arguments advanced by EFCO on this issue and find them unpersuasive. In so ruling we do not endorse the concept of a limine motion to secure a pretrial ruling to exclude evidence under the parol evidence rule.

II. *Were trial court's jury instructions erroneous?*

EFCO argues several of trial court's jury instructions were erroneous. We ignore several complaints not raised in trial court.

■ Both at trial and here EFCO asserts instructions 5 and 6, relating to the elements to be established by MPC on counts I and II, were erroneous in not defining special damages. EFCO relies on *Restatement (Second) of Torts* § 671 (1977), which addresses special damages in a cause of action for malicious prosecution, not slander of title. Moreover, instructions 5 and 6, relating to elements, were not designed to define or expand on the elements. The matter of defining the actual damages was addressed in instruction 9, which generally followed the definitions found in *Restatement (Second) of Torts* § 633, Comment e (1977), relating to pecuniary loss as a result of publishing an injurious falsehood causing a property sale to abort. Instruction 17 directed the jury to consider all the instructions together. We find no reversible error here.

■ At trial EFCO objected to instructions 5 and 7 as they related to the requirement that EFCO's publication be a "substantial factor" in bringing about Sturm's rescission of the sale. In instruction 7 the court defined "substantial factor":

The words "substantial factor" . . . do not mean that the action of the third party was determined exclusively or even predominantly by the publication of the statement—it would be enough if the statement is a factor in determining the third party's decision, even though the third party is influenced by other factors without which it would not decide to act as it does.

EFCO argues the word "substantial" means something more than the above definition, citing *Smith v. City of Fort Dodge*, 160 N.W.2d 492, 497–98 (Iowa 1968). In *Smith* we were interpreting a zoning statute, and referred to the dictionary definition of "substantial." (" 'That is of moment; essential; material . . . . That is such in substance or in the main . . . . Of or pertaining to the substance or main part of anything.' ") *Id.* at 497. But we also said "substantial" is a relative and not an exact term subject to a rule of thumb, that it was susceptible of different meanings

according to the circumstances of its use. *Id.* at 498.

More pertinent here are authorities addressing the meaning of "substantial factor" in the context of liability-creating causation of harm and damages. In *Speed v. State*, 240 N.W.2d 901, 905 (Iowa 1976), we approvingly cited *Restatement (Second) of Torts* § 431 (1977), where "substantial" is commented upon as being "used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause," *id.* Comment a, and is distinguished from having "a merely negligible effect," *id.* Comment b. More relevant is *Restatement (Second) of Torts* § 632, Comment c (1977), because it defines "substantial factor" in the context of legal causation of pecuniary loss resulting from a publication of an injurious falsehood:

In order for the false statement to be a substantial factor in determining the conduct of an intending or potential purchaser or lessee, it is not necessary that the conduct should be determined exclusively or even predominantly by the publication of the statement. It is enough that the disparagement is a factor in determining his decision, even though he is influenced by other factors without which he would not decide to act as he does.

It is apparent trial court's instruction 7 adopted the Restatement definition of "substantial factor." We find no error in this instruction on the applicable law.

■ EFCO asserts trial court erred in instruction 8–A, which stated:

As a matter of law Lot 3 is not burdened with restrictions or reservations which would permit Defendant Economy Forms Corporation to prevent the use of Lot 3 as a truck terminal.

EFCO here argues this confused the jury, "placed before the jury a question already decided as a matter of law," and further, "the truth of defendant's assertions was essentially precluded and defendant's good faith and reasonable belief in making the statements could not be considered by the jury." These contentions go well beyond

any objections asserted in trial court. Moreover, our holding in division I is determinative here. References to the alleged right of EFCO to control the use of lot 3 surfaced throughout the trial. The three-party exchange agreement was in evidence. The jury was entitled to be told, and not left to speculate, whether or not EFCO retained rights in lot 3 despite the terms of the contract.

III. *Were the damages awarded by the jury excessive?*

The jury awarded MPC a verdict for $35,000 compensatory and $10,000 punitive damages on count I, and $1000 compensatory and $1000 punitive damages on count II. EFCO contends these awards were not supported by competent or substantial evidence, were excessive, and were the result of passion and prejudice. Trial court granted EFCO's motion for remittitur and pared the compensatory damages on count I to $17,644. MPC filed the remittitur. Because EFCO has appealed in this new trial-remittitur situation, the original judgment is reinstated. *Larsen v. United Federal Savings and Loan Association*, 300 N.W.2d 281, 288 (Iowa 1981); Iowa R.Civ.P. 250. Thus we review the sufficiency of evidence to support the original verdicts.

We have recognized a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages. If it is speculative and uncertain whether damages have been sustained, recovery is denied. *Patterson v. Patterson*, 189 N.W.2d 601, 605 (Iowa 1971). If uncertainty lies only in the amount of damages, recovery may be had if there is a reasonable basis in the evidence from which the amount can be inferred or approximated.

*Larsen*, 300 N.W.2d at 288.

Trial court apparently arrived at the maximum compensatory damages on count I by adding the difference between the Sturm and the Des Moines Cold Storage sales to the $3500 damages MPC paid Sturm and the $3495 it paid the Sturm sale realtor. Although MPC attempted to produce some evidence it was damaged in its subsequent operations by Jennings' reckless statements, this proof fell far short of supporting a finding of further damages. We find the difficulties EFCO's unwarranted actions caused MPC, which foundationed count II, supported a compensatory award of at least $1000.

The punitive damages were justified on the basis of Jennings' malicious, reckless and wanton conduct and statements, and were well within the range of reasonableness.

We agree with trial court there was insufficient evidence to justify a verdict in excess of $17,644 as compensatory damages on count I. We therefore exercise our inherent right to order a remittitur. *See id.* at 289; *Miller v. Young*, 168 N.W.2d 45, 53 (Iowa 1969). If MPC shall file in this proceeding in district court a consent to remit all actual damages returned under count I over and above the sum of $17,644, within 30 days from the filing of this opinion, the district court judgment appealed from shall stand and shall draw interest at the statutory rates from the date of entry. If the consent to remit is not so filed, a new trial is hereby ordered.

IV. *Is MPC entitled to attorney fees?*

MPC asserts a successful plaintiff in a slander of title action is entitled to attorney fees as a part of its damages. The parties, by stipulation, reserved this question for the court before MPC rested its case. By posttrial motion MPC brought the issue before trial court. The motion was denied.

The question apparently is one of first impression in this jurisdiction. Ordinarily a successful party cannot recover attorney fees in Iowa in absence of a special statute, contract, or third-party action. *Turner v. Zip Motors, Inc.*, 245 Iowa 1091, 1098, 1100, 65 N.W.2d 427, 431–32 (1954). "Unless authorized by statute, attorneys' fees generally are not recoverable [in slander of title actions] either as damages or as costs." 50 Am.Jur.2d *Libel and Slander* § 550, at 1068 (1970).

The authorities relied on by MPC, including *Glass v. Gulf Oil Corp.*, 12 Cal.App.3d 412, 96 Cal.Rptr. 902 (1970); *Glusman v. Lieberman*, 285 So.2d 29 (Fla.App.1973); and *Summa Corp. v. Greenspun*, 607 P.2d 569 (Nev.1980), also involve quiet title actions or proceedings to nullify some disparaging instrument placed on record. This is consistent with our quiet title act, which provides for a minimal attorney fee under certain conditions. *See* § 649.5, The Code 1981. *See also Restatement (Second) of Torts* § 633 (1977).

We find no good cause to depart from our standing rule that forecloses an award of attorney fees to plaintiff in this tort action.

We modify and affirm on condition, and remand on the appeal. We affirm on the cross-appeal. Costs are taxed to EFCO.

MODIFIED AND AFFIRMED ON CONDITION, AND REMANDED ON THE APPEAL; AFFIRMED ON THE CROSS–APPEAL.