**COMMERCIAL TRUST AND SAVINGS
BANK OF STORM LAKE, Iowa,
Plaintiff-Appellant,**

v.

**TOY NATIONAL BANK OF SIOUX
CITY, Iowa, Defendant-Appellee.**

No. 84–1323.

Court of Appeals of Iowa.

June 25, 1985.

Daniel C. Connell and John Duffy of Connell & Duffy, P.C., Storm Lake, for plaintiff-appellant.

Robert R. Eidsmoe and John D. Ackerman of Eidsmoe, Heidman, Redmond, Fredregill, Patterson & Schatz, Sioux City, for defendant-appellee.

Heard by OXBERGER, C.J., and DONIELSON, and SCHLEGEL, JJ.

OXBERGER, Chief Judge.

The defendant bank prevailed below in an action by the plaintiff bank to recover amounts due on a participating loan. The court found an oral promise to repay the full amount of the loan from plaintiff was unenforceable. We reverse and remand.

On December 31, 1981, an officer of Toy National Bank contacted the president of Commercial Trust and Savings Bank, James Tymeson. The officer, Stan Fredericks, requested Commercial advance $300,000 as a participation in a line of credit to one of its customers, Richard Tetherow. Toy needed to find another bank to participate in the extension of credit because of federal regulations which limit the amount of money one bank may loan to a single entity. Section 84 of Chapter 12 of the United States code makes it illegal for a national bank to make a loan to a group of debtors who, under the code, are to be considered as one debtor, in amounts over ten percent of its capital stock account and unimpaired surplus. If the obligation is secured by livestock, and the livestock value is at least 115 percent of the fact amount of the note, then the lending limit is increased to 25 percent. 12 U.S.C. § 84(c)(9) (1985). Ten percent of the Toy bank's capital stock and unimpaired surplus is $1,111,899 and the Tetherow debt was secured by livestock. The legal lending limit to Richard and Janice Tetherow and the Tetherow Cattle Company was then $2,223,778. As of December 31, 1981, the Tetherow notes totaled $2,866,099. The bank would be in an "overline" situation if it lended more money and so asked for the participation of Commercial.

It is undisputed that in this conversation on December 31, Fredericks promised Tymeson that if Commercial would advance the money, Commercial would be paid in full on March 1, 1982, and would not suffer a loss. Commercial advanced the money based on the agreement. A week later Commercial received a written certificate of participation from Toy. The certificate provided that in the event of a default, Commercial would share pro rata in proceeds from sale of the collateral. Although this was different from the oral agreement, Tymeson did not object. Prior to March 1, 1982, Tymeson asked if Commercial would be paid in full and Fredericks again stated the bank would be fully repaid. No payment was received on the date, however, and another similar certificate of participation was sent from Toy to Commercial. Fredericks again told Tymeson Commercial would be paid in full. When payment was due on June 30, 1982, the notes became delinquent. Tymeson once more contacted Fredericks to inquire if Commercial would be paid in full, and was told that the bank would be paid and Toy was waiting for the land to be sold in order to make payment.

In August 1982 the Toy bank discovered the collateral was worth less than had been calculated and that there would be a loss on the loan. The Comptroller of Currency told the bank after an examination in November that Toy could not buy back the participation sold to Commercial and other banks because Toy had already charged over its legal lending limit. The examiners told the bank that it would be in violation of lending laws to do so.

Representatives of Toy met with the Commercial board of directors and offered to pay the Commercial bank's pro rata share of $140,000. The bank refused and Commercial sued to recover the full amount.

Toy had claimed that the oral agreement could not be enforced, since it was illegal under lending laws. The court disagreed, finding the agreement was legal, but held that the written certificate of participation was intended as the integrated and final agreement of the parties and the oral agreement merged into the terms as set out in the certificate. The court further found the oral agreement lacked sufficient terms to constitute a separate agreement.

■ The parole evidence rule prevents the admission of evidence that would vary or contradict the terms of the written instrument. *Montgomery Properties Corporation v. Economy Forms Corporation,* 305 N.W.2d 470, 476 (Iowa 1981); 32A C.J.S. *Evidence* § 972 (1964). An integrated agreement is one where the parties adopted the writing as a final expression of the bargain. *Id.* Parole evidence is allowed to show whether the certificate was meant to be the final expression of the parties. *Montgomery,* at 476.

■ The defendant points out that when an oral agreement precedes a written agreement on the topic, ordinarily it will be found the oral discussion merged into the written agreement. *S. Hanson Lumber Co. v. De Moss,* 253 Iowa 204, 207, 111 N.W.2d 681, 684 (1961). The defendant also acknowledges, however, that the key question is the intent of the parties. In *South Texas Land Co. v. Sorensen,* 199 Iowa 699, 703, 202 N.W. 552, 553 (1925), the court stated that the subsequent written agreement is the final expression when "the terms thereof are inconsistent with the earlier agreement *and intended to be substituted for it* ..." (emphasis added). There the court found sufficient intent from subsequent actions in compliance with the written terms. *Id.* There must be an indication of intent that the second agreement replaces the first. 17 Am.Jur.2d *Contracts* §§ 459, 483 (1964).

■ Rather than showing the second contract was the final agreement of the parties, the actions of the parties show an intent to continue to be bound by the first agreement. The officer at Toy, Mr. Fredericks, testified as follows:

Q. When you called Mr. Tymeson on December 31, 1981, pursuant to, you claim, Les Olson's direction and authority, did you feel you had authority to make the comment and the representations that you made over the phone? A. Based on what Les told me, yes.

Q. Did you feel at that time you owed Mr. Tymeson the responsibility to tell him the truth? A. Yes.

Q. All right. And you did tell him the truth, right? A. Yes.

Q. You told him what Les Olson had asked you to do, right? A. Um-hum (yes).

Q. And at that time you're representing something to him is that ordinary? A. When you say "ordinary," like—

Q. Is that what you normally do? A. No.

Q. What's different about this transaction, in all honesty? A. Les asked me to give them the bank representation that if there was a loss in the future, they would not suffer.

Q. Do you normally make such a representation? A. We don't.

Q. But in this case you did, right? A. Yes.

Q. And following that phone conversation, you obtained $300,000? A. Yes.

Q. And you haven't been able to carry out what you initially orally represented? A. That's right.

■ We agree the agreement was not illegal for two reasons. First, section 7.1135 of 12 CFR stated:

Sale of loan participations: agreement on effect of default. Where a participation in a loan is sold to another bank *the agreement may provide that repayment must first be applied to the share sold.* Since one of the purposes of such a sale may be to reduce the bank's retention of loans which may exceed its lending limit, the agreement should *as a matter of prudent banking practice also* provide that, in the event of default or a comparable event defined in the

agreement, the participants shall share in all subsequent repayments and collections in proportion to the percentage of participation at the time of the happening of the event.

(emphasis added). An agreement to pay in full is not prohibited by the regulation. In fact, it indicates that an agreement can indicate which bank shall be paid first. It does not require pro rata sharing, but suggests it as a matter of prudent banking practice.

The trial court also found that the evidence in the case showed, at best, that Tymeson might have known the oral assurance would violate lending limits, but nothing was presented proving Tymeson knew there would be a violation of lending limit laws. Knowledge of the violation of the lending limits is necessary to render the contract unenforceable. *Dove Creek State Bank v. Lawrence Warehouse Company,* 157 Colo. 263, 275, 402 P.2d 369, 374–75 (1965); *Labor Discount Center, Inc. v. State Bank and Trust Co. of Wellston,* 526 S.W.2d 407, 422 (Mo.App.1975). There is a presumption an agreement is legal and binding and the party asserting the illegality has the burden of proof. *Tschirgi v. Merchants National Bank of Cedar Rapids,* 253 Iowa 682, 692, 113 N.W.2d 226, 231 (1962); *Golf View Realty Co. v. Sioux City,* 222 Iowa 433, 439, 269 N.W. 451, 454 (1936). We do not find defendant has carried its burden of proof.

We reverse the judgment for defendant and remand for entry of a judgment in accordance with this opinion.

REVERSED AND REMANDED.