# IN THE COURT OF APPEALS OF IOWA

No. 23-1830
Filed July 23, 2025

JULIAN TONEY,
    Plaintiff-Appellant,

vs.

ARTHUR PARKER, HAZEL PARKER, and the ARTHUR E. PARKER AND
HAZEL FRANCES PARKER TRUST DATED 5/26/1993,
    Defendants-Appellees,

_____

ARTHUR PARKER, HAZEL PARKER, and the ARTHUR E. PARKER AND
HAZEL FRANCES PARKER TRUST DATED 5/26/1993,
    Counterclaim Plaintiffs-Appellees,

vs.

JULIAN TONEY,
    Counterclaim Defendant-Appellant.
_____

    Appeal from the Iowa District Court for Decatur County, Terry Rickers,

Judge.


    A counterclaim defendant appeals the district court's judgment finding that

he slandered the title of the counterclaim plaintiff and awarding punitive damages.

**REVERSED AND REMANDED**.


    Adam Witosky of Gribble Boles Stewart & Witosky Law, Des Moines, for

appellant.

    Daniel R. Rockhold of Rockhold Law PLLC, Corydon, for appellees.

Considered without oral argument by Schumacher, P.J., and Buller and Langholz, JJ.

**LANGHOLZ, Judge.**

Julian Toney wanted to buy Arthur and Hazel Parker's rural land that he had been renting for decades. But they repeatedly refused his offers. And then, when the Parkers listed the land for sale, Toney took many actions to prevent its sale, including claiming a lifetime lease of the land that allegedly caused a third party's offer to buy the land for $86,100 to fall through. Toney and the Parkers ended up in court—each bringing claims against the other. Yet all that is before us now is the district court's judgment—after a bench trial—that Toney slandered the Parkers' title causing them $62,100 in special damages and that they were entitled to $62,101 in punitive damages for this slander of title and a related trespass claim.

Toney appeals, arguing that the Parkers failed to prove their slander of title claim and that the district court erred in awarding punitive damages. We agree that the slander of title claim fails. Because Toney's previous unaccepted offer to buy the land cannot be used as the salable value of the land and the Parkers offered no other evidence of that value, the Parkers failed to prove that they suffered special damages—a necessary element of slander of title. And because the court granted punitive damages for both slander of title and trespass, we vacate that award and remand for the district court to decide the appropriate award for only the trespass claim.

## I. Background Facts and Proceedings

Beginning in the 1970s, Toney and his family started renting a twenty-four-acre parcel of land—the Y farm—from Ruth Parker. When Ruth passed away, the property was conveyed to her son, Arthur Parker, and his wife, Hazel. The property was later placed into a trust. Toney continued to rent the Y farm from the Parkers,

using it for farming, cattle, and timber. He paid $200 a year in rent for the land. Over the years, Toney offered to buy the land from the Parkers, each time being told no. In September 2016, the Parkers put the land up for sale.

After learning the Y farm was on the market, Toney again offered to buy the land from the Parkers. And again, they refused to sell it to him. Toney then confronted the Parkers' realtor while the realtor was on the land, telling the realtor that he had a lifetime lease of the land and an option to purchase. And Toney testified at trial that this lease was signed by him and Arthur Parker in 1974 on the hood of a running pickup. Later, Toney also contacted the State Archaeologist's office to report that an Indian burial ground was on the land. Toney claims that Ruth Parker told him about the burial ground when she was alive, but the Parkers claim that Ruth never told them anything about this. And Toney hung signs on the Y farm, including ones that warned that there is no building or hunting on the land, that Iowa feedlot rules apply, and that it is a Potawatomi burial ground.

In September 2016, the Parkers received an offer from a third party to buy the land for about $86,000. But ultimately, the sale fell through, which Hazel Parker testified was because of Toney's claim of having a lifetime lease on the land. And Toney also acknowledged that his purported interest in the land was the reason the sale fell through. After this, the Parkers filed and served Toney with an action for forcible entry and detainer.[1] The next business day, Toney recorded the purported lifetime lease with option to purchase. The lease was forwarded to the

---

[1] The court dismissed their case because it found that Toney had a farm tenancy and the Parkers had not complied with the notice requirements for terminating such a lease under Iowa Code chapter 562 (2016).

Parkers, and they claimed that this was their first time seeing it. Indeed, Arthur Parker denied ever signing the lease.

The Parkers served Toney with a notice of termination of his farm tenancy in July 2017, explaining that he had until March 2018 to vacate the land. And on the last day of his tenancy, Toney petitioned for a "temporary and permanent injunctive order protecting [him] from [the Parkers'] efforts to seize ownership and control of the Y farm," a "declaratory judgment that the terms and conditions of the life time lease" give Toney "the right to purchase the Y farm," and a breach of contract claim. The Parkers counterclaimed, asserting claims of slander of title, ejectment, trespass, and quiet title and seeking punitive damages.

The Parkers then moved for summary judgment on all the claims. After striking Toney's resistance for multiple rules violations, the district court granted summary judgment for the Parkers on all of Toney's claims and on their counterclaims for ejectment, trespassing, and quiet title. The court ordered Toney to vacate the property within thirty days of the judgment. The court denied summary judgement on the Parkers' counterclaims for slander of title, damages for trespass and ejectment, and punitive damages. During this time, Toney sent letters to the Parkers, maintaining that he still had rights to the land and offering to buy it for $1000 per acre—$24,000 in total. Following a bench trial on the remaining counterclaims in October 2019, the district court found Toney liable for slander of title and awarded the Parkers around $78,000 in damages. It also found Toney in contempt for failing to remove his cattle and signs from the land.

Toney appealed, and our supreme court reversed both the summary-judgment and bench-trial rulings, holding that the district court abused its discretion

in striking Toney's resistance to summary judgment. *See Toney v. Parker*, 958 N.W.2d 202, 208–11 (Iowa 2021). So it remanded the case to be heard by a new district judge. *Id.* at 211. Upon remand, the district court granted the Parkers' summary judgment motion on all of Toney's claims and on the Parkers' ejectment, trespass, and quiet title counterclaims. The court again left the issues of slander of title, damages, and punitive damages for trial.

After a two-day bench trial, the district court ordered judgment against Toney on the Parkers' slander of title claim. The court found that Toney had acted with malice and that the Parkers had suffered special damages of about $62,000. It concluded that the lease was not signed by Arthur Parker, based on handwriting samples and testimony from the Parkers. The court reasoned that "the purported lease and option is a fiction and a forgery created by Toney solely to render the title to the Y farm unmarketable." And the court calculated the amount of damages by taking the contract price for the sale of the Y farm—$86,100—and subtracting the value that Toney had offered the Parkers for the land—$24,000. In assessing damages for trespass, the court found that Toney's trespass on the land had diminished its value by $1 based on him putting signs up on the land and failing to remove one of them. And the court found that the Parkers were entitled to recover punitive damages totaling $62,101 for both their slander of title and trespass claims and $822 in attorney fees.[2]

Toney now appeals.

---

[2] The court also reconsidered its summary-judgment ruling for the Parkers on their ejectment claim and instead dismissed it, reasoning that the claim was "not properly joined to this action."

## II.     Slander of Title—Special Damages

To establish a slander-of-title claim, a party must prove by a preponderance of the evidence five elements: "(1) an uttering and publication of slanderous words; (2) falsity of those words; (3) malice; (4) special damages to the [party]; and (5) an estate or interest of the [person] in the property slandered." *Davitt v. Smart*, 449 N.W.2d 378, 379 (Iowa 1989); *see also Henderson v. Millis*, 373 N.W.2d 497, 506 (Iowa 1985).  While Toney makes a number of arguments as to how the Parkers failed to prove this claim, we need not go any further than the "essential element[]" that the Parkers sustained "special damages."  *Witmer v. Valley Nat'l Bank of Des Moines*, 273 N.W. 370, 371 (Iowa 1937); *see also Davitt*, 449 N.W.2d at 379 (reversing slander-of-title verdict where evidence was lacking for two elements).  Because the district court heard these claims in equity, our review is de novo.  *Brown v. Nevins*, 499 N.W.2d 736, 737 (Iowa Ct. App. 1993).

"Special damages are such as actually result from the wrongful act, but are not such a necessary result that they will be implied by law."  *Kock v. Burgess*, 149 N.W. 858, 860 (Iowa 1914); *cf. Hoffman v. Clark*, 975 N.W.2d 656, 665 (Iowa 2022) (describing special damages in the context of libel per se as the those "which result from the loss of something having economic or pecuniary value" (cleaned up)).  This requirement to prove "special harm . . . in all cases" is a key difference between slander of title and other defamation claims.  Restatement (Second) of Torts § 624 cmt. a (Am. L. Inst. 1977).  The "most usual" manner of proving special damages for slander of title is by showing a financial loss caused "by preventing a sale to a particular purchaser."  *Id.* § 633 cmt. c.  And that loss must be shown by establishing the "difference between the price that would have been realized by it

and the salable value of the thing in question." *Id.* § 633 cmt. e; *see also Montgomery Props. Corp. v. Econ. Forms Corp.*, 305 N.W.2d 470, 477 (Iowa 1981) (finding no reversible error in jury instructions that followed the definition in comment "e" for defining special damages).

Toney argues that the Parkers did not prove special damages because the record lacks any evidence to establish the "salable value" of the land when it was marketable. The Parkers point to, and the district court relied on, Toney's offer to purchase the land for $1000 per acre—a total price of $24,000—as the needed market value to prove special damages. But generally, an "unaccepted offer for the purpose of real estate should not be received as evidence of the value of such real estate." *Hardaway v. City of Des Moines*, 166 N.W.2d 578, 581 (Iowa 1969); *see also Danamere Farms, Inc. v. Iowa Dep't of Transp.*, 567 N.W.2d 231, 232 (Iowa 1997) (reaffirming *Hardaway* and extending it to hold that even an accepted offer of land should not have been used when the land sale failed before closing). This makes sense because "market value" and related "terms refer to the price which a willing buyer under no compulsion to buy would pay a willing seller under no compulsion to sell." *Hardaway*, 166 N.W.2d at 583.

The Parkers make no attempt to distinguish this case from the general rule established in *Hardaway*. But even assuming this is the "exceptional case" where an unaccepted offer could be probative on value, *id.* at 581, at best the unaccepted offer would prove that the land value is *at least* $24,000 since Toney was willing to buy it at that price. An unaccepted offer proves nothing about how much higher the market value is because we do not know how low a price a willing seller would accept. Yet unlike the condemnation-proceeding context discussed in

*Hardaway*—where a landowner is trying prove a value at least as high as the compensation sought—here the Parkers had the burden to prove that the market value was *less than* their lost sale at the price of $86,100.  And proving that the value is something more than $24,000 does not make it any more likely—and certainly not more likely than not—that the value was indeed less than $86,100.  If anything, the Parkers' refusal to accept that offer would suggest that $24,000 was too low a value.  What's more, because the Parkers had the burden on this essential element of special damages, Toney had no obligation to come forward with alternative evidence proving a higher value.

Neither does Toney's testimony that at one point Arthur Parker was "ready to sell" the land and "want[ed] $1,000 an acre" get to the market value.  Such evidence merely shows that Arthur was thinking about selling the land and ultimately did not do so.  And the Parkers presented no other evidence of the land's market value, such as an appraisal or comparable sales.[3]

Without any evidence in the record of the market value, the Parkers failed to prove that any slander of their title caused them harm.  And so, they have failed to establish the essential element of special damages.  *See Allen-Pieroni v. Pieroni*, 535 S.W.3d 887, 889 (Tex. 2017) (reversing trial court's slander-of-title judgment because "the record contain[ed] no evidence of the slandered property's market value").  We thus reverse the district court's judgment finding that Toney slandered the Parkers' title and awarding $61,100 of special damages.

---

[3] Given the many ways a party could prove market value, we find no merit in the Parker's argument that requiring such evidence creates an "impossible" burden.

### III.     Punitive Damages

Toney also argues that the district court erred in awarding the Parkers punitive damages on their slander-of-title and trespass claims.  Because we find that the Parkers failed to establish all the elements for their slander of title claim, we cannot award punitive damages for that conduct.  *See Pringle Tax Serv., Inc v. Knoblauch*, 282 N.W.2d 151, 154 (Iowa 1979) (holding that punitive damages can be awarded for an intentional tort without the court awarding actual damages, but a harm must have occurred and been proven).  But we must still consider whether the punitive-damage award is supported by the unappealed trespass claim.

To be entitled to punitive damages for trespass, a plaintiff must show that the trespass was "committed or continued with a willful or reckless disregard of another's rights" or was "intentional . . . without just cause or excuse."  *White v. Citizens Nat'l Bank of Boone*, 262 N.W.2d 812, 817 (Iowa 1978).  We agree with the district court that the evidence justifies some award of punitive damages for only the trespass claim—especially Toney's conduct of willfully leaving posted an Indian-burial-ground sign even after submitting an affidavit to the court that he removed all the signs.  But the court analyzed the award for the trespass claim and the slander-of-title claim together and awarded a single amount of $62,101—equal to the total amount of other damages awarded on the claims.  We thus vacate the punitive-damage award and remand to the district court to determine the appropriate amount of punitive damages for only the trespass claim.

**REVERSED AND REMANDED**.

Schumacher, P.J., concurs; Buller, J., dissents.

**BULLER, Judge** (dissenting).

In my view, the majority makes the mistake of conflating whether there was evidence supporting an element with whether a party proved the element in the way we as appellate judges might prefer. I also might have tried this case differently and offered different evidence than the Parkers. But that is no basis for reversal. I therefore dissent.

The disputed element in this slander-of-title case is "special damages." The majority correctly recites the law in noting that the typical method of proof is to subtract the difference between the thwarted sale price and the salable value after the slander when the property was again marketable. *See Montgomery Props. Corp. v. Econ. Forms Corp.*, 305 N.W.2d 470, 477 (Iowa 1981) (approving of Restatement (Second) of Torts § 633 cmt. e (Am. L. Inst. 1977)). The majority seemingly accepts there was adequate proof of the thwarted sale price, and I agree. So the fight is over the sub-element concerning the salable value of the land after the slander when it was again marketable.

As the fact-finder able to hear the evidence and see the witnesses first-hand, the district court offered this analysis surrounding special damages:

> The court concludes that the Parkers have suffered special damages. They had a valid contract for the sale of the Y farm for $86,100.00. This is significantly more than the 24 acres is worth as pasture and represents a premium for the farm as hunting ground. Toney put a value on the farm as pasture and timber when he offered $1000 per acre for it. The court concludes that Parkers have been damaged by Toney's slander of title in the amount of $62,100.00.

(internal footnote omitted). As the basis for these findings, the court cited the contract thwarted by the slander and the written offer from Toney to buy the land after.

The majority notes the "general rule" is "that an unaccepted offer for the purchase of real property is not admissible as evidence of the market value of such real property." *Hardaway v. City of Des Moines*, 166 N.W.2d 578, 580 (Iowa 1969). We don't need to guess as to the purpose of this general rule because the supreme court spelled it out:

> It is, at most, a species of indirect evidence of the person making such offer as to the value of the land. He may have so slight a knowledge on the subject as to render his opinion of no value. Oral and not binding offers are so easily made and refused in a mere passing conversation, and under circumstances involving no responsibility on either side, as to cast no light upon the question of value, and they are unsatisfactory, easy of fabrication and even dangerous. There is no opportunity to cross examine the person making the offer to show his knowledge, intent or the basis of his offer.

*Id.* at 580–81 (cleaned up). After carefully considering the basis for the general rule, I would not apply it here, when the evidence as to market value came by written offer from the slanderer and was used to determine the amount of special damages.

Courts are somewhat divided on the admissibility of unaccepted offers to purchase. *See generally* Vitauts M. Gulbis, Annotation, *Unaccepted Offer for Purchase of Real Property as Evidence of its Value*, 25 A.L.R.4th 571 (1983). Generally, jurisdictions that have admitted unaccepted offers require:

> that the offer was made in good faith, by a person of sound business judgment acquainted with the value of property in the area and having the financial ability to purchase the property, that the offer was for cash, and that it was made with respect to the market value of the property and not a value derived from a private need or fancy of the offeror. At least one jurisdiction has added the additional requirement that the offer must be testified to by the offeror in order to afford the adverse party an opportunity for cross-examination. Other authorities, without particularly detailing the contents of the foundational showing, have admitted evidence of unaccepted offers

> to purchase as some evidence of value where the bona fides of the offer and the qualifications of the offeror were sufficiently presented to permit the finder of fact to make an informed evaluation of the offer.

*Id.* § 2[a] (internal citations omitted); *see also City of Chicago v. Harrison-Halsted Bldg. Corp.*, 143 N.E.2d 40, 45 (Ill. 1957). Only bona fide offers made by legitimate potential buyers may be admissible because, in the absence of an actual sale, they are the next best determination of value. *See City of Chicago v. Lehmann*, 104 N.E. 829, 831 (Ill. 1914) (awarding "great liberality" and "great freedom" to courts in admitting evidence of "offers proved to be bona fide" to determine property value). After the court determines that the offer is bona fide, "further questions concerning the viability of the offer go to its weight and not to its admissibility." *State ex rel. State Highway Comm'n v. Pfizer, Inc.*, 659 S.W.2d 537, 542 (Mo. Ct. App. 1983). In short, other courts tend to "recognize[] an exception to the general rule in exceptional cases . . . where the evidence establishes the foundation of a *bona fide* offer so firmly and completely that the trial court did not abuse its discretion in receiving the offer into evidence." *Lower Makefield Twp. v. Lands of Dalgewicz*, 4 A.3d 1114, 1120 (Pa. Commw. Ct. 2010) (collecting cases from multiple jurisdictions).

The facts of this case fit nicely through the door our supreme court left open in *Hardaway* because it is an "exceptional case[] in which the evidence establishes a foundation for a bona fide offer so firmly and completely that the trial court would not abuse its discretion in receiving evidence of such offer." 166 N.W.2d at 581. Toney's offer valuing the property at $24,000 does not suffer from the concerns the supreme court feared in *Hardaway*: he is not unfamiliar with the land or its use,

the offer was not made in passing conversation, and he was fully available for examination at trial. *See Evans v. Sawtooth Partners*, 723 P.2d 925, 928–29 (Idaho Ct. App. 1986) (upholding admission of evidence when the offeror testified in person and was subject to cross-examination, there were no confrontation or hearsay issues, and the offer was not speculative or ill-informed); *Schymanski v. Conventz*, 674 P.2d 281, 286 (Alaska 1983) (noting that cross-examination of the offeror bypassed the typical rationale for barring testimony of unaccepted offers to purchase). If Toney thought $24,000 was not an accurate valuation, he certainly could have testified accordingly—and he didn't. The Parkers also didn't refute his valuation of the property at trial. And admitting this bona fide offer to the property owner "on the question of value" is consistent with other supreme court precedent going back more than a century. *Faust v. Hosford*, 93 N.W. 58, 61 (Iowa 1903).

As a practical matter, I fear the majority opinion rewards Toney for his slander. I can understand why the Parkers thought the value Toney offered them was a fair basis to calculate the delta between the thwarted sale price and the market value they could obtain now. While perhaps it would have been better for them to offer evidence in the vein of an appraisal or broker price opinion, the district court heard testimony Arthur Parker wanted to sell for $1,000 an acre and the court credited Toney's offer letter for this amount as a bona fide attempt to purchase the property. I discern no abuse of discretion in reaching that conclusion. *See Hardaway*, 166 N.W.2d at 581. And on appellate review of this record, I decline to join the majority in speculating as to the market value of the property or that "at best the unaccepted offer would prove that the land value is *at least* $24,000,"

when the district court properly credited the best evidence presented at trial as to value.

I dissent from reversing this matter to give Toney a third attempt to wriggle out of fairly compensating the Parkers for him slandering their title.