WAYNE E. STEVENSON AND MARILYN J. STEVENSON, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Stevenson v. Commissioner
Docket Nos. 15671-81, 10897-82, 10898-82.
United States Tax Court
T.C. Memo 1986-207; 1986 Tax Ct. Memo LEXIS 403; 51 T.C.M. (CCH) 1050; T.C.M. (RIA) 86207; May 21, 1986
Robert A. Hutchison and John V. Donnelly, for the petitioners in docket No. 15671-81. Robert J. Murray, for the petitioners in docket Nos. 10897-82 and 10898-82. J. Anthony Hoefer, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows: Docket No.
Petitioners
Year
Deficiency
15671-81
Wayne E. Stevenson
1974
$5,259
and Marilyn J. Stevenson
1977
104,214
10897-82
J. L. Griffith and Connie
1977
27,438
Griffith
10898-82
Ronald E. Nielsen and
1977
29,672
Carolyn M. Nielsen
*405 After concessions, [2] the sole issue for decision is whether petitioner Wayne E. Stevenson received a guaranteed payment taxable pursuant to sections 707(c)[3]3 and 736(a)(2) upon his departure from an accounting partnership in which petitioners J. L. Griffith and Ronald E. Nielsen were also partners. Respondent is essentially a disinterested stakeholder in this case, concerned only that the Court treat all of the partners consistently. To protect the revenue, respondent has taken inconsistent positions, treating the entire guaranteed payment of $234,401 as ordinary income to petitioner Stevenson, on the one hand, and denying the deduction to the partnership and hence denying deduction for their allocable portion of the expense to petitioners Griffith and Nielsen, on the other hand. FINDINGS OF FACT Some of the facts *406 have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Wayne E. Stevenson (Stevenson) and Marilyn J. Stevenson, husband and wife, resided in Urbandale, Iowa, at the time they filed their petition in this case. Petitioners J. L. Griffith (Griffith) and Connie Griffith, husband and wife, and petitioners Ronald E. Nielsen (Nielsen) and Carolyn M. Nielsen, husband and wife, resided in West Des Moines, Iowa, at the time they filed their petitions in this case. The couples filed their joint Federal income tax returns (Forms 1040) for the years in issue with the Internal Revenue Service Center in Kansas City, Missouri. Petitioners Marilyn J. Stevenson, Connie Griffith, and Carolyn M. Nielsen are parties to this case solely because they filed joint Federal income tax returns for the years in issue with their respective husbands. Stevenson, Griffith, and Nielsen are collectively referred to as petitioners. At all times pertinent hereto, petitioners were certified public accountants engaged in the practice of their profession in the State of Iowa. Before July 1, 1973, Stevenson practiced *407 certified public accounting in partnership with Wayne L. Simmer (Simmer) in Des Moines, Iowa. On July 1, 1973, Stevenson and Simmer merged their firm into another accounting partnership that became known as Mosebach, Griffith, Simmer & Company (the partnership). The partnership engaged in the profession of certified public accountancy, offering general accounting services, tax advice, and management services to the general public. The partnership had offices in several Iowa cities and towns, including Des Moines, Cedar Rapids, Tama, Muscatine, and Grundy Center. Pursuant to the merger, Stevenson and Simmer became general partners in the partnership and executed the partnership's agreement of general partnership. Stevenson and Simmer each contributed $50,000 cash to the partnership's capital. To reflect the clients Stevenson and Simmer brought to the partnership, the partnership gave them vested interests in guaranteed payments in the amount of $91,142 each, to be paid upon their departure from the partnership. These guaranteed payments were unfunded. Griffith and Nielsen, along with several other individuals, were also partners in the partnership. Larry F. Mosebach (Mosebach) *408 was, and up to the time of trial continued to be, the partnership's managing partner. Effective December 31, 1975, the partners, including Stevenson, Griffith, and Nielsen, executed a revised agreement of general partnership (the partnership agreement). The partnership agreement was quite extensive, particularly on matters regarding partners withdrawing from the partnership. The agreement provided that the partnership would repay a departing partner his capital account in 60 equal, nonthly installments with interest at the annual rate of 10 percent on the unpaid balance. The partnership agreement also required the partnership to make guaranteed payments to departing partners and provided that such payments be treated under section 707(c) and 736(a)(2) as deductible by the partnership and as ordinary income to the departing partner.The partnership agreement contained a lengthy formula for determining the guaranteed payments due each partner and the vesting dates thereof. However, these "vested" guaranteed payments were unfunded and were not reflected as liabilities on the partnership's balance sheet. They were to be paid without interest to a departing partner in equal, monthly *409 installments over a 10-year period beginning after the partner's departure. However, if a partner left before reaching age 55, the 10-year payment period was increased one year for every year between his age at the departure date and age 55. The partnership agreement prohibited a former partner from providing accounting services to or soliciting business from any partnership client. It obligated a former partner to pay the partnership liquidated damages equal to 200 percent of the greater of the partnership's previous or current year's business volume for any partnership client lost due to a breach of the noncompetition provision. The partnership agreement permitted a partner to voluntarily withdraw from the partnership on 60 days' notice. It also allowed the partnership to expel a partner "for cause." The agreement listed causes for expulsion, including "[s]ignificant breaches of the Agreement and established Partnership policies and regulations." A partner expelled for cause forfeited his guaranteed payments, which served to satisfy his obligation to pay liquidated damages incurred by the partnership due to the cause for which the partner was expelled. The partnership agreement *410 made no provision for the sale of partnership clients to departing partners. Amendments to the agreement were not effective until "executed and attached to [the agreement] as a part of the same." The partnership modified the agreement from time to time by attaching to it various exhibits dealing with the amounts of the partners' capital accounts, annual basic compensation, monthly draws, and guaranteed payments. Over a period of two or three years, some of the partners expressed concern about Stevenson's manner and method of practicing accounting. They thought that Stevenson was not complying with established partnership policies such as timely turning in time records and recording phone calls. They also thought that he sometimes promised work within an unreasonable time frame, maintained sloppy workpapers, failed to follow the partnership's procedures, and inadequately supervised employees. A number of times Mosebach, as managing partner, discussed these shortcomings with Stevenson, who assured Mosebach that he would comply with partnership policies and procedures. However, the situation came to a head on July 25, 1977. Stevenson prepared a set of financial projections for *411 a group of investors interested in acquiring a Coor's beer distributorship. The investors needed the projections to obtain financing. Partnership policy and procedures required all projections to be reviewed internally before release. Stevenson's projections were not reviewed by the partnership before Stevenson presented them to the investors and the bank officers. The partnership's management committee, consisting of Mosebach, Griffith, and Simmer, was meeting that day and learned that the projections had gone out without being reviewed. The management committee members telephoned the other partners and called a partnership meeting for that evening. After Stevenson returned from his meeting with the investors and the bank officers, Mosebach confronted Stevenson about the infraction and told him that the partners were meeting to vote on his expulsion from the firm. Stevenson was excluded from the meeting. At the meeting, the management committee explained to the other partners what had transpired that day. After the partners discussed the matter, they voted to expel Stevenson for cause. Mosebach called Stevenson into the meeting and told him that the partners had voted to *412 expel him for cause. Stevenson then left the meeting and went back to his office. Mosebach later went to Stevenson's office and told Stevenson that he had been expelled for cause but if he would agree to turn over to the partnership the clients that he had brought to the partnership and was personally responsible for, then the partners would change the expulsion to one without cause and pay him the guaranteed payments he would be entitled to under the partnership agreement. Stevenson was then 45 years old, and the guaranteed payments would be made without interest over a 20-year period. If he agreed, Stevenson would get guaranteed payments in the amount of $234,401, payable in equal, monthly installments in the amount of about $975 per month over 20 years.The payments would not bear interest and were unfunded. Stevenson rejected Mosebach's proposal. He told Mosebach that he had been in the accounting profession all his life, that he was going to stay in the accounting profession, and "in so many words told him [Mosebach] what he could do with his guaranteed payments." [4]
*413 After this discussion with Mosebach, Stevenson turned the matter over to his attorney, Marvin Winick (Winick). For the next four to six weeks, Stevenson set up offices for his own practice and continued servicing the clients he worked for while he was with the partnership. During that time, Winick negotiated the terms of Stevenson's departure from the firm with Mosebach and Griffith. At Mosebach's request, Stevenson prepared two lists of clients. The first list was of clients whose accounts receivable and work-in-process Stevenson eventually purchased from the partnership. In addition to their names, the list states the dollar volume of work the partnership performed for each client during 1976, and the total thereof, amounting to $109,919. The second list was of clients whose filed Stevenson wanted to take with him. [5]Stevenson knew that he would not be working for some of the listed clients because they had already told him they were making other plans to obtain accounting services. Nevertheless, Stevenson wanted the files of those clients because he had been responsible for them and might need the files to answer any questions they might have in the future. For those clients *414 Stevenson expected to continue servicing, the partnership's 1976 dollar volume of work was between $75,000 and $80,000. The partnership would not have retained most of the listed clients whether or not Stevenson took them with him. No one in the partnership (other than Stevenson) knew anything about those clients. Also, the partnership was not interested in continuing to service several of the listed clients. On August 23, 1977, Stevenson and his attorney, Winick, met with Mosebach, Griffith, and the partnership's attorney, George Sullivan (Sullivan), to try to resolve the terms of Stevenson's departure. At the meeting, Stevenson presented to Mosebach and Griffith the two client lists he had prepared at Mosebach's request. He also submitted at that time release forms from many of these clients requesting that the partnership turn its files for the clients over to Stevenson. The release forms were not acceptable to Mosebach, *415 so Stevenson had to get the clients to sign additional forms satisfactory to the partnership. He eventually gave the partnership release forms for almost all, if not all, of the listed clients. At the meeting, the parties also discussed the repayment of Stevenson's capital account in the partnership. On September 6, 1977, Stevenson and the partnership entered into a written agreement (the separation agreement) setting forth the terms and conditions of Stevenson's termination from the partnership. In pertinent part, the separation agreement provided as follows: 1. The parties agree that Stevenson will cease to be a partner of the Partnership effective as of the close of business of the Partnership on August 31, 1977, hereinafter referred to as "termination date". The parties further agree that except as provided for in this Agreement, neither party shall have any further liability or obligation whatsoever to the other party and all rights and obligations of Stevenson under the Partnership's partnership agreement including, but not limited to, Stevenson's right to receive any further remuneration or guaranteed payments from the Partnership are terminated as of the "termination *416 date". 2. It is understood and agreed that Stevenson will continue in the practice of accountancy apart from the Partnership and that he will be rendering professional services to certain present clients of the Partnership listed on Schedule A attached hereto. It is further agreed that contemporaneously with the execution of this Agreement, Stevenson will purchase for cash the work-in-process and billed accounts receivable relating to such clients at the amounts set forth in such Schedule A, and the Partnership will assign, transfer and convey all of their interest in such work-in-process and billed accounts receivable to Stevenson. 3.Contemporaneously with the execution of this Agreement, Stevenson will purchase the accounts receivable listed on Schedule B attached hereto for the sum of $5,000.00 and the Partnership will assign and convey all of their interest in such accounts receivable to Stevenson. * * * 5. Contemporaneously with the execution of this Agreement, the Partnership will pay Stevenson the sum of $60,000.00 in full settlement of his capital account in the Partnership. 6. The Partnership shall release to Stevenson from time to time any and all files pertaining *417 to the clients listed on Schedule A attached hereto upon delivery to the Partnership of a release executed by the client and in the form previously furnished by the Partnership to Stevenson. If the release is not in the same form as that furnished by the Partnership, the Partnership will nevertheless release files to Stevenson pursuant to other written forms of release (including telegrams). In such event, Stevenson shall deliver executed releases from such clients on the form furnished by the Partnership within 60 days of the date of this Agreement. 7. The parties agree to cooperate with each other in the connection with the transition of Partnership clients to Stevenson as contemplated hereunder and in matters relating to clients retained by the Partnership. The parties further agree to execute such additional documents as may be necessary to effect the termination of Stevenson's status as a partner in the Partnership and to put into effect the terms and conditions of this Agreement. There were two Schedule A's attached to the separation agreement, corresponding with a few changes, to the two client lists Stevenson had prepared and presented to Mosebach at the August 23rd *418 meeting. The first Schedule A (and Schedule B) listed clients whose accounts receivable and work-in-process Stevenson was purchasing from the partnership for $61,146.10. In accordance with the separation agreement, the partnership formally assigned, by a written assignment agreement also executed on September 6, 1977, all of its right, title, and interest to the listed accounts receivable and work-in-process to Stevenson. As of the close of partnership business on August 31, 1977, Stevenson had contributed $60,000 in cash or other property to the partnership's capital, and as of such date, his paid-in capital account in the partnership had a credit balance of $60,000. [6]Stevenson's $60,000 capital account and expense reimbursements due him in the amount of $212.55 were offset against his obligation to the partnership for the accounts receivable and work-in-process the partnership assigned to him. This left a net amount of $933.55 Stevenson owed the partnership, which he paid by check. *419 Winick, Stevenson's attorney, drafted the separation agreement. However, both Mosebach and Sullivan, the partnership's attorney, reviewed the agreement before Mosebach signed it. Other than the written assignment agreement executed along with the written separation agreement, there were no other agreements, written or oral, between Stevenson and the partnership regarding his departure from or any interest in the partnership. Stevenson received nothing else from the partnership other than his draw through August 31, 1977, in the amount of $33,028. He did not receive any portion of the partnership's profits for 1977. He did not receive any guaranteed payment. After departing from the partnership, Stevenson began practicing accounting under the name of Stevenson & Company. He hired two former partnership employees, Michael Beaderstadt and Daniel J. Sigler (Sigler). Shortly thereafter, Stevenson received a letter from Mosebach dated September 15, 1977, which stated as follows: We have now learned, two days after the final settlement, of your unethical solicitation of two of our employees. Our firm negotiated, in good faith with you, a settlement allowing you to withdraw a *420 substantial number of clients, obtain complete files, etc., all completely outside the provisions of our Partnership Agreement. We certainly do not condone your actions and are sorry to find out that you chose methods other than those recognized as ethical by our profession. On January 3, 1978, the partnership filed a petition in the District Court of the State of Iowa in and for Polk County, seeking (1) injunctive relief and damages for Sigler's breach of the noncompetition clause of his employment agreement with the partnership, (2) injunctive relief and damages for Stevenson's breach of the partnership agreement's noncompetition clause, and (3) specific performance of the separation agreement's requirement that Stevenson provide the partnership with release forms for all of the client files he took with him. The partnership brought this suit to keep Sigler from performing services for former partnership clients that Stevenson took and to keep Stevenson and his firm from soliciting other partnership clients. The district court granted damages and injunctive relief against Sigler and dismissed the partnership's claims against Stevenson for breach of the partnership agreement, *421 concluding that the separation agreement was a novation of the partnership agreement. [7] Sigler appealed and the partnership cross appealed, but both appeals were dismissed before any additional formal action was taken by the appellate court. The partnership *422 also sued Stevenson in small claims court for about $110 it claimed Stevenson owed for telephone calls. The court dismissed the case. In addition, the parthership filed a complaint against Stevenson with the ethics committee of the Iowa Society of Certified Public Accountants. That complaint was also dismissed. For Federal income tax purposes, the partnership reported its 1977 income on the accrual method of accounting on a calendar taxable year. Each petitioner reported his income on the cash method of accounting. Nielsen prepared the partnership's 1977 Federal partnership return of income (Form 1065) including the schedule K-1's (partner's share of income, credits, deductions, etc.) thereto under Mosebach's supervision. Mosebach and Nielsen intentionally made no entry on line 14 of the partnership's return, labeled "Guaranteed payments to partners." On line 24 of the return, labeled "Other deductions," they entered the amount of $613,688. On a supporting statement attached to the return, Mosebach and Nielsen itemized the other deductions, including "Guaranteed Payments--Retired Partners" in the amount of $244,901. They viewed $234,401 of that amount as deductible by the *423 partnership and includable in Stevenson's income. On the supplemental schedule of gains and losses (Form 4797) attached to its 1977 return, the partnership reported section 1231 gain in the amount of $234,401 from "sale of practice." Mosebach signed the partnership's 1977 return under penalties of perjury. On their respective 1977 Federal income tax returns (Forms 1040), Griffith and Nielsen each reported his allocable share of the partnership's items of ordinary income (including deductions) and section 1231 gain, including the items described above. The partnership provided Stevenson with a schedule K-1 showing that Stevenson had ordinary income from the partnership during 1977 in the amount of $33,028. Mosebach and Nielsen intentionally did not show any other income, including guaranteed payments, from the partnership on the schedule. The schedule K-1 comported with Stevenson's knowledge of the facts and understanding of the transaction. On his 1977 Federal income tax return, Stevenson reported ordinary income from the partnership in the amount of $33,028, the amount indicated on his schedule K-1. Stevenson also claimed a tentative refund for 1974 from unused investment *424 credit in the amount of $5,259. Stevenson did not see a copy of the partnership's return until 1979 when he received a copy of it from the Internal Revenue Service during the audit of his 1977 tax return. In a statutory notice of deficiency to Stevenson dated April 13, 1981, respondent determined that Stevenson received additional income in the amount of $234,401 in conjunction with his withdrawal from the partnership. Respondent also determined that Stevenson's investment tax credit in the amount of $5,259 reduced his increased 1977 tax liability and consequently was not available as an unused investment credit carryback to 1974. Respondent therefore increased Stevenson's 1974 tax liability by that amount. In statutory notices of deficiency to Griffith and Nielsen dated April 5, 1982, respondent determined that they each had additional income resulting from a disallowance of the guaranteed payments deduction claimed by the partnership in the amount of $234,401. ULTIMATE FINDINGS OF FACT 1. Stevenson was removed from the partnership for cause. 2. Stevenson did not receive any guaranteed payment upon his departure from the partnership. OPINION This case involves a rather *425 bitter dispute among partners of an accounting firm, and respondent is simply a stakeholder in the matter. The issue for decision is whether petitioner Stevenson received a guaranteed payment taxable pursuant to sections 707(c) and 736(a)(2) upon his departure from the partnership. If so, the guaranteed payment is taxable to Stevenson as ordinary income and deductible by the partnership as a business expense. Petitioners Griffith and Nielsen, two of the several other partners, argue that the partnership paid Stevenson a guaranteed payment pursuant to an oral agreement whereby Stevenson and the partnership allegedly agreed to offset the guaranteed payment against the purchase price Stevenson purportedly paid for the right to provide accounting services to certain partnership clients after he left the partnership. The issue is purely a factual one. At the trial Stevenson objected to the admissibility of evidence in regard to the purported oral agreement, relying on the parol evidence rule. We reserved ruling on Stevenson's standing objection and heard the evidence. For the reasons set forth *426 below, we agree with Stevenson that the evidence is not properly admissible. However, even considering that evidence, the Court cannot find that there was such an oral agreement. We conclude and have found as a fact that the only agreement between petitioner Stevenson and the partnership was the written separation agreement and written assignment agreement, both dated September 6, 1977. Mosebach, the managing partner, and Griffith both testified that at the partnership meeting held on July 25, 1977, Stevenson was not expelled for cause, but was given a choice to either voluntarily withdraw from the partnership or be expelled for cause. However, Mosebach admitted that he thought Stevenson could have been expelled for cause. They also stated that Stevenson did not immediately make a choice, but that two or three days later, he told Griffith that he wanted to set up his own practice and needed a client base. Thus, according to their version of the facts, Stevenson voluntarily withdrew from the partnership, and therefore was entitled to guaranteed payments provided under the partnership agreement. Ensuing negotiations purportedly involved Stevenson's acquisition of the right to service *427 certain partnership clients. According to Mosebach, Stevenson prepared the client list containing the 1976 billings for listed clients to enable the parties to determine an appropriate purchase price for those clients. Mosebach testified that at the August 23rd meeting, he and Stevenson agreed (1) to set the amount of such billings at $117,200, [8] (2) to set the purchase price for the clients at 200 percent of this amount or, $234,400, and (3) to offset the guaranteed payments the partnership purportedly owed Stevenson in the amount of $234,401 against the purchase price, thereby effectively canceling out the two obligations. The 200 percent of prior year billings formula was derived from the liquidated damages provision of the partnership agreement, which required a former partner to pay the partnership as liquidated damages 200 percent of prior year billings of any partnership client lost due to the partner's breach of the agreement's noncompetition clause. To support the above testimony, Griffith and Nielsen offered Mosebach's notes from the August 23rd meeting and a letter he sent to all of the *428 partners after Stevenson's departure was complete. Mosebach's notes consist of nine points, the third of which is as follows: "List of clients WES wants to serve. Marvin Winick - Philosophy. Wash list with guaranteed payments." Mosebach's letter to the other partners, dated September 7, 1977, stated: "Enclosed are copies of the AGREEMENT and ASSIGNMENT which terminate Wayne Stevenson's interest in the Partnership. The clients released offset in total Wayne's guaranteed payments." Stevenson argues that this evidence of the alleged oral agreement violates the parol evidence rule because the alleged oral agreement contradicts or varies the terms of the separation agreement. The so-called parol evidence rule is a misnomer; the rule is one of substantive law and not one of evidence. Estate of Craft v. Commissioner,68 T.C. 249, 262-263 (1977) (Court reviewed), affd. per curiam 608 F.2d 240 (5th Cir. 1979); 9 Wigmore, Evidence, sec. 2400, p. 4 (Chadbourn rev. 1981); 3 Corbin, Contracts, sec. 573, pp. 357-358 (1960); 4 Williston, Contracts, sec. 631, p. 956 (3d *429 ed. 1961); 2 Restatement, Contracts 2d, Comment a. to sec. 213, p. 129 (1981). This Court has followed two approaches in applying the parol evidence rule. In cases concerning the proper allocation or character of amounts paid under a contract, we have held that "because respondent was not a party to the instrument involved, neither he nor petitioner may successfully rely on the rule to exclude extrinsic evidence offered by the other." Estate of Craft v. Commissioner,supra,68 T.C. at 260, 263, and cases cited therein. However, in cases requiring a determination of legal rights and property interests under state law, we follow the applicable state parol evidence rule. Estate of Craft v. Commissioner,supra,68 T.C. at 261-263, and cases cited therein. Here, we must determine the terms and conditions of Stevenson's departure from the partnership and the legal rights and property interests resulting therefrom. Thus, we apply Iowa's parol evidence rule in determining the admissibility of evidence regarding the alleged oral agreement. Stevenson argues that such evidence violates Iowa's rule, relying on the holding of the Iowa Supreme *430 Court in Montgomery Properties v. Economy Forms,305 N.W.2d 470, 476 (Iowa 1981) that: [W]here the handcrafted contract contains an integration clause, where the parties were sophisticated business persons represented by counsel and of equal bargaining strength, and where terms of the alleged oral agreement reasonably would be expected to be included in the * * * agreement, [the] trial court did not err in sustaining a parol evidence rule objection, thus excluding evidence to vary its terms. Thus we must determine whether the three requirements enumerated by the Iowa Supreme Court in Montgomery Properties have been satisfied. First, the written contract must contain an integration clause. Griffith and Nielsen point out that the written contract in Montgomery Properties v. Economy Forms,supra,305 N.W.2d at 472, specifically stated that it "supersedes any contracts or Offers to Buy and Sell Real Estate which may previously have been executed." They argue that the separation agreement does not contain an express statement that it supersedes *431 all prior negotiations between the parties, and therefore does not satisfy this first requirement. We do not think the Iowa Supreme Court intended the requirement to be construed so narrowly. In the same paragraph containing its definition of the parol evidence rule, the Iowa Supreme Court stated that "[a]n integrated agreement is one in which the parties adopt a writing or writings as the final and complete expression of the agreement." Montgomery Properties v. Economy Forms,supra,305 N.W.2d at 476. See Kitchen v. Stockman National Life Insurance Co.,192 N.W.2d 796, 800 (Iowa 1971); 2 Restatement, Contracts 2d, sec. 209, p. 115 (1981); 3 Corbin, Contracts, sec. 588, pp. 520-530 (1960).[9]
*432 Of course, extrinsic evidence of the alleged oral agreement is admissible to show that the separation agreement is not an integration. Montgomery Properties v. Economy Forms,supra,305 N.W.2d at 476, and cases cited therein. See 9 Wigmore, Evidence, sec. 2430(2), p. 98-99 (Chadbourn rev. 1981). However, as noted in our findings of fact (n.4, supra), we found Stevenson to be a more credible witness than Mosebach and Griffith and, as will be discussed more fully below, his testimony and other evidence convince us that there was no agreement other than the separation agreement (and related assignment agreement) between Stevenson and the partnership. [10] Moreover, the separation agreement's recitals specifically state that in it "the parties desire to set forth their agreement with respect to the terms and conditions of [Stevenson's] termination." In addition, the first paragraph of the agreement explicitly provides that "[t]he parties further agree that except as provided for in this Agreement, neither party shall have any further liability or obligation whatsoever to the other party * * *." This plain language evidences the parties' clear intent to *433 set forth all the terms of Stevenson's termination, and therefore constitutes an integration clause.Thus, the first requirement of the Iowa parol evidence rule is satisfied. We think this result clearly comports with the purpose of the parol evidence rule: [W]hen the parties have discussed and agreed upon their obligations to each other and reduced those terms to writing, the writing, if clear and unambiguous, furnishes better and more definite evidence of what was undertaken by each party than the memory of man * * *. The rule rests upon a rational foundation of experience and policy and is essential to the certainty and stability of written obligations. it is designed to permit a party to a written contract to protect himself against perjury, infirmity of memory, or the death of witnesses. [Montgomery Properties v. Economy Forms,supra,305 N.W.2d at 476, quoting 30 Am.Jur.2d Evidence sec. 1016, at 151-152 (1967). (Emphasis supplied by the Iowa Supreme Court.)] *434 Griffith and Nielsen argue that the separation agreement is not an integration because the following emphasized language of the separation agreement's first paragraph implies, they say, that there was some prior agreement, i.e., the alleged oral agreement, between the parties: The parties further agree that except as provided for in this Agreement, neither party shall have any further liability or obligation whatsoever to the other party and all rights and obligations of Stevenson under the Partnership's partnership agreement including, but not limited to, Stevenson's right to receive any further remuneration or guaranteed payments from the Partnership are terminated as of the "termination date". [Emphasis added.] Their argument strains our credulity. A much more reasonable interpretation is that "further" in the first underscored phrase refers back to the "except as provided for in this Agreement" language immediately preceding it, and that "further" in the second underscored phrase refers to the draws Stevenson received from the partnership before his departure. In the context of the dispute raging between Stevenson and the partnership, we cannot believe that every *435 detail of the minor agreement as to his capital account, accounts receivable, and work-in-process was carefully hammered out and documented, but the major agreement as to guaranteed payments was the subject of an oral agreement. To suggest that the one word "further" shows the existence of such an alleged oral agreement is to distort plain English. The second requirement under Montgomery Properties is that the parties are sophisticated business persons represented by counsel with equal bargaining strength. Both Mosebach, the partnership's managing partner and chief negotiator, and Stevenson are certified public accountants with a great deal of business and tax experience. Stevenson and the partnership were both represented by counsel. Winick, Stevenson's counsel, drafted the separation agreement, and Sullivan, the partnership's counsel, reviewed it for the partnership. There is no evidence that either the partnership or Stevenson had a bargaining advantage over the other. Thus, the second requirement is satisfied. Finally, the terms of the alleged oral agreement must reasonably be expected to be included in the written contract. Under the alleged oral agreement, Stevenson *436 and the partnership purportedly agreed to offset Stevenson's alleged right to guaranteed payments in the amount of $234,401 with Stevenson's alleged obligation to pay the partnership such amount as the purchase price for certain partnership clients. The written separation agreement states that "[i]t is understood and agreed that Stevenson * * * will be rendering professional services to certain present clients of the Partnership listed on Schedule A attached hereto." The clients so listed are the clients Griffith and Nielsen allege Stevenson purchased. The separation agreement also provides that "[t]he parties agree to cooperate with each other in * * * connection with the transition of Partnership clients to Stevenson as contemplated hereunder." Thus, the separation agreement clearly contemplates that Stevenson would be providing accounting services to the purportedly purchased clients. Yet this written separation agreement makes no mention of any purchase of clients. The only purchase mentioned is Stevenson's purchase of certain clients' accounts receivable and work-in-process, the $61,146.10 price for which Stevenson paid by offsetting his capital account and expense reimbursements *437 due in the amount of $60,212.55 and delivering to the partnership his check for the difference ($933.55). We cannot and do not believe that the parties would so specifically set forth their agreement as to accounts receivable and work-in-process valued at $61,146.10 and not include in the same document their agreement as to guaranteed payments in the amount of $234,401, almost four times as much money. The acrimonious nature of Stevenson's departure further justifies our disbelief of such an improbable scenario. Because of the interrelationship of any such guaranteed payments with the whole subject of the separation agreement and the amount of money involved, we would reasonably expect the terms of the alleged oral agreement to be included in the separation agreement. All three of its requirements having been met, the Iowa Supreme Court's holding in Montgomery Properties dictates that all evidence concerning the alleged oral agreement be excluded under the parol evidence rule. Nonetheless, Griffith and Nielsen argue that any one of three exceptions to the parol evidence rule require that the evidence be admitted. In In Re Simplot's Estate,215 Iowa 578, 246 N.W. 396, 398 (1933), *438 the Iowa Supreme Court set forth five exceptions to the parol evidence rule. One exception (the third listed in Simplot's Estate) is that an oral contract may be proved by extrinsic evidence if it (1) is contemporaneous with the written contract, (2) is purely collateral to the written contract, (3) is complete in itself, (4) does not contradict or vary and of the written contract's terms, and (5) stands upon its own terms and consideration. In Re Simplot's Estate,supra,246 N.W. at 398. Griffith and Nielsen argue that the alleged oral agreement satisfies these requirements. As demonstrated above, the written separation agreement evidences the parties' clear intent to set forth all the terms of Stevenson's termination. Thus, Griffith and Nielsen's contention that there are other terms and conditions of Stevenson's termination in itself contradicts the separation agreement. As also noted earlier, the separation agreement clearly contemplates that Stevenson would be servicing listed clients, the same clients Stevenson purportedly purchased under the alleged oral agreement. *439 Yet the separation agreement makes to mention of any such purchase. Griffith and Nielsen's assertion that Stevenson purchased these clients under the alleged oral agreement at least varies the terms of the separation agreement. Thus, this exception is of no avail to them. A second exception to the parol evidence rule (the fifth listed in Simplot's Estate) is that a single contract may be expressed partly in writing and partly in parol. In Re Simplot's Estate,supra,246 N.W. at 398. "However, a written contract is presumed to be complete and to comprise the entire transaction unless it otherwise appears from the written terms of the contract itself." In Re Simplot's Estate, supra,246 N.W. at 398. Griffith and Nielsen argue that language in the separation agreement suggests the existence of other terms of the agreement. [11] They reiterate their assertion that use of the word "further" in the separation agreement's first paragraph is an "obvious" reference to the alleged oral agreement. We disagree. We need not repeat our reasons for rejecting this contrived argument. The separation agreement on its face precludes application of this exception. *440 Finally, Griffith and Nielsen argue that a third exception adopted by the Iowa Supreme Court in Gordon v. Witthauer,258 Iowa 617, 138 N.W.2d 918, 921 (1965), quoting Wise v. Quina,174 So.2d 590, 597 (Fla. Dist. Ct. App. 1965), applies: A written contract or agreement may be altered or modified by an oral agreement if the latter has been accepted and acted upon by the parties in such manner as would work a fraud on either party to refuse to enforce it. * * * Griffith and Nielsen contend that in reliance upon the alleged *441 oral agreement, the partnership relinquished its rights to perform future accounting services for listed clients and that Stevenson accepted the benefit of that transfer. They further argue that immediately after the agreement was reached, Stevenson began soliciting release forms from those clients so that he could obtain their files from the partnership. Thus, Griffith and Nielsen continue, Stevenson accepted and acted upon the alleged oral agreement and to refuse to enforce it would work a fraud on them. To support their theory, Griffith and Nielsen point out that Stevenson sought and delivered release forms to the partnership before the separation agrement was signed. They deduce from this fact that Stevenson sought such release forms pursuant to the alleged oral agreement. However, they did not challenge, and now ignore, Stevenson's testimony (which we accepted) that he submitted release forms for many of the clients at the August 23rd meeting at which the alleged oral agreement was purportedly entered into. Thus, Stevenson sought release forms before, not in reliance upon, the alleged oral agreement. The fact that Stevenson presented such forms to the partnership before the *442 separation agreement was signed does not show that he acted on the alleged oral agreement and should be bound by it under this third exception to the parol evidence rule. In sum, the requirements for application of the parol evidence rule set forth by the Iowa Supreme Court in Montgomery Properties,supra, have been satisfied. Moreover, none of the exceptions urged by Griffith and Nielsen applies. Therefore, all evidence of the alleged oral agreement could properly be excluded. However, even if such evidence is considered, we conclude that it does not establish the existence of the alleged oral agreement. In any event, resolution of this case depends on whose version of the facts we accept. According to Stevenson, the written separation agreement contained all the terms and conditions of his termination from the partnership, and by executing the separation agreement, the parties in effect tore up the partnership agreement and relinquished their respective rights under it. Mosebach, on the other hand, claimed that the partnership agreement was still in effect and that in addition to executing the separation agreement, the parties orally agreed to offset *443 guaranteed payments due to Stevenson in the amount of $234,401 with the price he was to pay for partnership clients in the same amount. The written separation agreement supports Stevenson's testimony. It contains language to the effect that it is the exclusive agreement between the parties regarding Stevenson's departure from the partnership. It also negates Stevenson's rights and obligations under the partnership agreement, including his right to receive any further remuneration or guaranteed payments from the partnership. The agreement acknowledges that Stevenson would be performing accounting services for certain partnership clients listed in Schedule A to the agreement. It makes no mention of any purchase or sale of such clients. Griffith and Nielsen repeat their tenuous argument that use of the word "further" in strategic places in the separation agreement amounts to an acknowledgement of the alleged oral agreement. We reject this argument for the reasons indicated above. As the Court stated at trial, it has difficulty believing that these two warring factions memorialized a $61,000 aspect of Stevenson's termination and did not memorialize a $234,401 aspect. In fact, the *444 Court simply does not believe it. Griffith and Nielsen argue that the separation agreement was silent about the alleged oral agreement because Stevenson's counsel, Winick, was the draftsman. They suggest rather invidiously that Winick did not put the alleged oral agreement's terms in the separation agreement because he did not want to leave a "paper trail" for the Internal Revenue Service. However, Mosebach testified that during the negotiations, he knew that Stevenson would not agree to the tax consequences sought by the partnership regarding an offset of guaranteed payments and client purchase price. Mosebach admitted that an attempt to confirm the offset in writing could have have ended the negotiations. Thus, Griffith and Nielsen in effect are arguing that the alleged oral agreement was entered into, but not set forth in writing, because Stevenson would not agree to the tax consequences that would clearly flow from it. We think this amply demonstrates the lack of factual support for Griffith and Nielsen's position. Mosebach testified that he considered the alleged oral agreement's tax consequences controlled by the partnership agreement. Before the tax consequences could arise, *445 however, there had to be an oral agreement to purchase clients and to offset guaranteed payments against client purchase price. We are unconvinced that such an agreement was made. We believed Stevenson's testimony that there was no such agreement. Mosebach's position on this point, and the other partners' overall position in this litigation, is premised on the existence of such an oral agreement and the partnership agreement's continuing to govern Stevenson's termination. Again, we disagree. We have found as a fact that the partnership expelled Stevenson for cause. Under the partnership agreement this negated his right to guaranteed payments and other rights in the partnership. The parties by their written separation agreement in effect tore up the partnership agreement, and Mosebach's continued reliance on it is misplaced. The separation agreement specifically states that "all rights and obligations of Stevenson under the Partnership's partnership agreement are terminated." In the state court litigation, the Iowa District Court for Polk County held that the separation agreement was a novation of the partnership agreement. [12] Moreover, Mosebach himself, in a letter to Stevenson *446 shortly after the separation agreement was signed, described Stevenson's termination as being "completely outside the provisions of our Partnership Agreement." That letter also stated that Stevenson was allowed to withdraw clients. It said nothing about a purchase of clients for $234,401 or offsetting guaranteed payments against such purported purchase price. Furthermore, even the purported terms of the alleged oral agreement demonstrate a total disregard for the partnership agreement. The partnership agreement clearly does not permit the sale of partnership clients to departing partners. It requires the payment of liquidated damages by a former partner who provides accounting services to former partnership clients. In addition, the partnership agreement required the partnership to pay Stevenson his guaranteed payments in monthly, noninterest-bearing installments over 20 years. Under the alleged oral agreement, the guaranteed payments were accelerated in one payment as an offset against the purchase price for partnership clients. Thus, it is abundantly clear that the terms of Stevenson's termination *447 were outside and wholly contrary to the provisions of the partnership agreement. Other factors also lead us to accept Stevenson's testimony as opposed to that of Mosebach and Griffith. The partnership did not claim a deduction for the alleged guaranteed payments on the line of its return specifically designated therefor. Instead, the deduction was lumped with other items under "Other Deductions" and listed with those other items on a schedule attached to the return. In addition, the partnership did not include any guaranteed payments on the schedule K-1 it prepared for Stevenson. Mosebach admitted that these omissions were intentional and defended them by saying that they were made because the partnership was involved in state court litigation with Stevenson, and the partners, primarily Nielsen and Mosebach, made a "professional judgment" not to include the alleged guaranteed payments on Stevenson's schedule K-1. We found this explanation disingenuous, to say the least. Griffith and Nielsen argue that the partnership's reporting position is inconsequential because Stevenson was not misled by the absence of the guaranteed payment on his schedule K-1. We disagree. The schedule *448 K-1 was intentionally misleading, and Stevenson was misled. Stevenson received the schedule K-1 and found it wholly consistent with the facts and with his understanding of the transaction. He prepared his tax return based on that schedule K-1; the partnership and the other partners prepared their returns on an inconsistent basis; hence, this litigation. Stevenson did not see the partnership return until he was audited and received a copy of it from the Internal Revenue Service. The partnership intentionally "buried" the deduction on its return, and thus in effect tried to hide it from Stevenson and the Internal Revenue Service. There is also evidence that the alleged oral agreement theory developed rather recently. In a letter to the auditing agent dated October 24, 1979, Mosebach stated that the negotiations for Stevenson's purchase of clients resulted in the separation agreement. In addition, the petitions of both Griffith and Nielsen in this case allege that Stevenson "wished to purchase certain clients from the firm. An agreement was reached with respect to his wishes and made a part of the [separation] Agreement." (Emphasis added.) The above factors outweigh any *449 problem we have with Stevenson's testimony. During the state court litigation, Stevenson apparently testified that he purchased certain clients or accounts from the partnership. See n.7, supra. At the trial in this case, Stevenson claimed that these statements were made based on the premise that the partnership agreement was still in effect and that in using the term purchase he was referring to liquidated damages that the partnership agreement required from a former partner for breaching its noncompetition clause. Griffith and Nielsen argue that we should rely on these previous statements in rejecting Stevenson's denial of the purchase and offset. They point out that in its opinion, the Iowa District Court for Polk County stated: "The Court has considered that Wayne E. Stevenson admitted having paid 200% of a year's services or billings as consideration for the list of clients he took with him." However, the District Court also stated that "there is no further evidence of payment [by Stevenson] beyond $61,146.10," the amount he paid for the accounts receivable. In addition, there is no indication that Stevenson ever admitted agreeing to offset a purchase price for clients *450 with guaranteed payments or otherwise receiving any guaranteed payments from the partnership. Thus, while we find Stevenson's prior testimony rather garbled and somewhat troubling, we have primarily relied upon the sworn testimony in this Court. Here we had the opportunity to observe the demeanor of the witnesses and to make our own determinations as to credibility. Diaz v. Commissioner,58 T.C. 560, 564 (1972). Griffith and Nielsen contend that other evidence fully supports Mosebach's testimony regarding the alleged oral agreement. They argue that we should accept Mosebach's testimony because it is fully corroborated by the notes he took during the August 23rd meeting. However, those notes at best represent Mosebach's impressions of the negotiations that took place at the meeting. The notes provide no evidence that they are terms of an agreement by the parties. Some of the points made in the notes were incorporated into the separation agreement. Other points, according to Griffith and Nielsen, evidence the existence of the alleged oral agreement. The notes also contain points that not even Griffith and Nielsen argue were agreed upon. In short, Mosebach's *451 notes are not probative evidence that the alleged oral agreement was made. [13]
Griffith and Nielsen point to a letter Mosebach wrote to the other partners dated September 7, 1977, which states "[t]he clients released offset in total [Stevenson's] guaranteed payments." They *452 argue that this statement is further evidence of the alleged oral agreement. However, the letter represents Mosebach's unilateral statement to his partners of his version of what took place. There is no evidence that Stevenson acquiesced in Mosebach's characterization. He testified he did not, and we believed him. Griffith and Niensen contend that Stevenson included the 1976 gross billings on the draft of the client list that became the first Schedule A to the separation agreement so that he and the partnership could calculate the purchase price for the listed clients. However, Stevenson stated that he included the billing figures only because Mosebach requested them. More importantly, that client list became the first Schedule A to the separation agreement, which was the list of clients whose accounts receivable and work-in-process Stevenson purchased. The second Schedule A to the agreement, according to Mosebach, lists the clients Stevenson allegedly purchased. However, the draft thereof did not state the clients' billings. Thus, there is no evidence that the parties calculated the total 1976 billings for all clients allegedly sold to Stevenson so that a purchase *453 price could be determined. In addition, the separation agreement provides, and Stevenson testified, that the second Schedule A was attached to the separation agreement simply to identify the clients for which Stevenson was to provde release forms in order to obtain their files from the partnership. Griffith and Nielsen argue that the purchase price was determined by taking 200 percent of the 1976 billings for clients purchased. However, those clients' 1976 billings, as shown on the draft client list, totaled only $109,919.Two hundred percent of that number yields a purchase price of $219,838. Griffith and Nielsen offered no probative evidence and only weak explanations of why the over $14,000 difference between the calculated purchase price and Stevenson's alleged guaranteed payments in the amount of $234,401 was ignored by the parties. The lack of evidence or plausible explanation is especially damaging because the partnership required Stevenson to pay the $933.55 difference between the agreed price for the accounts receivable he purchased and his capital account, which was offset against such purchase price. In addition, Stevenson testified, and we have found as a fact, that *454 the 1976 billings for clients he anticipated actually remaining with him were only between $75,000 and $80,000. Griffith and Nielsen also contend that the partnership would not simply allow Stevenson to take a number of partnership clients without receiving consideration therefor and that Stevenson would not just "walk away" from $234,401 in guaranteed payments. They argue that clients were considered clients of the partnership and not of particular partners. This, they continue, is why Stevenson received vested guaranteed payments in the amount of $91,142 upon joining the partnership. We have amply demonstrated above that the parties disregarded the partnership agreement in negotiating Stevenson's departure. We also think that the partnership had little control over the clients Stevenson took with him. He was the only person in the partnership who knew anything about those clients. The partnership would not have retained most of them regardless of whether Stevenson took them with him. Mosebach admitted that the partnership was not interested in retaining several of these clients. Moreover, Stevenson's "vested" guaranteed payments were unfunded, and he considered them of little *455 value when compared with the money he could make by practicing on his own. He understandably was not interested in trading his professional career and future livelihood for monthly guaranteed payments in the amount of about $975 for 20 years. Lastly, the partnership terminated Stevenson for cause, and he was not entitled to any guaranteed payments. Thus, we reject Griffith and Nielsen's argument on this point. In summary, based on the record as a whole, we find the evidence supporting Stevenson's version of the facts more persuasive, and accept it. Thus, we hold that Stevenson did not receive any guaranteed payments from the partnership in connection with his termination therefrom. To reflect the foregoing, [14]
*456 Decision will be entered for petitioners in docket No. 15671-81.
Decisions will be entered under Rule 155 [15] in docket Nos. 10897-82 and 10898-82. Footnotes
1. Cases of the following petitioners are consolidated herewith: J. L. Griffith and Connie Griffith, docket No. 10897-82; Ronald E. Nielsen and Carolyn M. Nielsen, docket No. 10898-82.↩
2. The Griffiths and the Nielsens concede respondent's denial of claimed section 1244 losses and bad debt deductions. ↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.↩
4. Stevenson's testimony on this point, as on virtually every major point in this case, is in direct conflict with the testimony of Mosebach and Griffith. Mosebach and Griffith testified that although the partners believed they could expel Stevenson for cause they gave him the opportunity to withdraw from the partnership voluntarily, "but one way or another he [Stevenson] was leaving." Griffith further testified that shortly after the partnership meeting, Stevenson told Griffith that he wanted to set up his own practice, which Griffith took as Stevenson's decision to voluntarily withdraw from the partnership. As discussed more fully in our opinion, we generally found Stevenson to be a more credible witness than Mosebach or Griffith.↩
5. Mosebach testified that this was a list of clients the partnership sold to Stevenson for $234,401, the amount of the purported guaranteed payment. The Court did not believe his testimony, and the record as a whole shows the facts to be otherwise.↩
6. The parties have stipulated to this figure of $60,000, and we have accepted their stipulation. We note that Stevenson's schedule K-1 attached to the partnership information return (Form 1065) for the year 1977 shows a capital account at the beginning of the year of $101,139. The record does not show whether, when, or how the other $41,139 of Stevenson's purported capital account was distributed to him; however, in view of other purported errors that Mosebach testified were intentionally made on Stevenson's K-1, the Court accords little or no weight to any representations on the partnership's Form 1065 and attachments thereto.↩
7. We reiterate our statement at trial that although the Iowa district court's decision may be helpful in considering issues of law, the Court is not bound by any of the district court's factual determinations. See Commissioner v. Estate of Bosch,387 U.S. 456 (1967) Counsel for Stevenson as well as counsel for the other partners used bits and pieces of the district court record to try to impeach the testimony of Mosebach or Stevenson, respectively, but these efforts contributed more confusion than enlightenment. We place primary reliance upon the sworn testimony given in this proceeding, testimony that was clear, addressed to the issues of the case but in sharp conflict. However, resolving such conflicts in testimony is the ultimate task of the fact finder -- "the distillation of truth from falsehood which is the daily grist of judicial life." Diaz v. Commissioner,58 T.C. 560, 564↩ (1972).
8. The total 1976 billings, as indicated on the client list, were $109,919.↩
9. A written contract is presumed to embody all of the parties' agreements. In Re Simplot's Estate,215 Iowa 578, 246 N.W. 396, 398 (1933). See 9 Wigmore, Evidence, sec. 2430(3), p. 99 (Chadbourn rev. 1981) ("If it is mentioned, covered, or dealt with in the writing, then presumably the writing was meant to represent all of the transaction on that element.") Moreover, the execution of a written agreement makes inoperative all contemporaneous oral agreements relating to the same subject matter, and such contemporaneous oral agreements cannot thereafter be used to add to or vary the written agreement. Weik v. Ace Rents, Inc.,249 Iowa 510, 87 N.W.2d 314, 318 (1958). See 2 Restatement, Contracts 2d, sec. 213↩, p. 129 (1981).
10. Although Mosebach is not a party to this case, he is a partner in the partnership and will be affected by our decision to the same extent as Griffith and Nielsen. While a statutory notice of deficiency has not yet been issued to Mosebach, he apparently has agreed to be bound by the outcome of this case.↩
11. We note the inconsistency of this position with Griffith and Nielsen's constant characterization of the alleged oral agreement and the separation agreement as two separate and independent contracts. They make no effort to reconcile these contradictory approaches except to say that because the separation agreement contains no integration clause and refers to other terms, it does not matter whether the alleged oral agreement is considered a separate agreement or part of a larger agreement expressed partly in writing and partly in parol. Because we disagree with both premises, we need not address this inconsistency.↩
12. While we are not bound by this holding, we certainly have no quarrel with it.↩
13. Griffith and Nielsen suggest that this Court should draw some adverse inference from the fact that Winick's notes of that meeting were not offered. The record does not show that any such notes were in existence, and if those petitioners wanted the notes (if extant), they should have used the discovery procedures of this Court to try to obtain them and not ask this Court to speculate as to what, if anything, such notes (if they exist) may show. Actually, since the written separation agreement was thereafter executed, we think any notes of preliminary negotiations would have little or no probative value. The fact that the written separation agreement thereafter executed is silent about matters contained in Mosebach's notes convinces the Court that if those matters were discussed at the meeting with Stevenson and his attorney, they were rejected by them, not made the subject of an oral agreement.↩
14. Petitioners in all three dockets requested in their petitions that we award them attorneys fees. Stevenson filed his petition on June 30, 1981. Griffith and Nielsen filed their petitions on May 21, 1982. Thus, we have no jurisdiction to award such fees in this case. McQuiston v. Commissioner,78 T.C. 807 (1982), affd. without published opinion 711 F.2d 1064 (9th Cir. 1983). Under section 7430, added to the Code by section 292(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 572, 1982-2 C.B. 462, 546-547, we have authority to award reasonable litigation costs to a "prevailing party" in a proceeding commenced in this Court after February 28, 1983. See also Rules 230-233. However, Rule 34 in pertinent part provides that "[a] claim for reasonable litigation costs shall not be included in the petition in a deficiency or liability action." (Emphasis added.) In general, under Rule 231, the time for making such claims is after the substantive issues have been resolved. Here, the Court finds it rather ironic that petitioners seek to recover their litigation costs from respondent. Respondent is a disinterested stakeholder in this matter. These lawsuits resulted from the partners' own internal partnership squabbles and the partners' inconsistent treatment on their tax returns of the purported guaranteed payments. While Stevenson may have been an innocent victim, respondent was not resposible for his plight.↩
15. In their Reply Brief, Griffith and Nielsen for the first time raise alleged computational errors in their notices of deficiency based on respondent's failure to use income averaging, to reduce their capital gains for their allocable shares of the capital gain the partnership reported from the alleged sale of clients to Stevenson, and to properly compute automatic adjustments. We will not consider matters raised for the first time on brief. Neely v. Commissioner,85 T.C. 934, 943-944↩ (1985). However, if there are purely computational errors, the parties will be given an opportunity to try to resolve them in their Rule 155 computations.